ACCEPTED
03-14-00706-CV
4408166
THIRD COURT OF APPEALS
AUSTIN, TEXAS
3/6/2015 4:23:10 PM
JEFFREY D. KYLE
CLERK

## No. 03-14-00706-CV

_____

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
3/6/2015 4:23:10 PM
JEFFREY D. KYLE
Clerk

IN THE COURT OF APPEALS
FOR THE THIRD DISTRICT OF TEXAS
AUSTIN, TEXAS

_____

ENTERGY TEXAS, INC.,
*Appellant,*

v.

PUBLIC UTILITY COMMISSION OF TEXAS, ET AL.,
*Appellees.*

_____

Appealed from the 345th Judicial District Court of Travis County, Texas
The Honorable Amy Clark Meachum, Judge Presiding
Trial Court Cause No. D-1-GN-13-002623

_____

## BRIEF OF APPELLEE STATE AGENCIES
_____

KEN PAXTON
Attorney General of Texas

CHARLES E. ROY
First Assistant Attorney General

JAMES E. DAVIS
Deputy Attorney General for Civil
Litigation

DAVID A. TALBOT, JR.
Chief, Administrative Law Division

KATHERINE H. FARRELL
State Bar No. 24032396

SARA R. HAMMOND
State Bar No. 24081003

Assistant Attorneys General
Office of the Attorney General
Energy Rates Section
Administrative Law Division
P. O. Box 12548
Austin, Texas  78711-2548
Telephone: (512) 475-4173
Facsimile:  (512) 320-0167

March 6, 2015

# TABLE OF CONTENTS

TABLE OF CONTENTS ..............................................................................................ii

INDEX OF AUTHORITIES ......................................................................................iv

ISSUES PRESENTED ............................................................................................vii

STATEMENT REGARDING ORAL ARGUMENT .......................................................viii

BRIEF OF APPELLEE STATE AGENCIES ................................................................ 1

STATEMENT OF FACTS ......................................................................................... 2

SUMMARY OF THE ARGUMENT ............................................................................ 4

STANDARD OF REVIEW ....................................................................................... 6

ARGUMENT AND AUTHORITIES ........................................................................... 8

   1. The Commission's disallowance of expenses incurred advocating for financial-based incentive compensation was reasonable and supported by substantial evidence. (Addresses ETI's Issues 1 and 2) .......................................... 8

      A. The Commission has broad discretion to disallow expenses that it determines are unreasonable. ..................................................................... 8

      B. The Commission's finding that ETI was unreasonable to expend resources on the incentive compensation issue was reasonable and supported by substantial evidence. ................................................. 10

      C. Having properly determined ETI's argument was unreasonable, the Commission's disallowance of expenses arising therefrom was proper. ......... 14

         i. Disallowance of expenses unreasonably incurred is consistent with previous Commission actions .................................................... 15

         ii. No new standard was applied .................................................... 17

         iii. The Commission properly took action in a contested case hearing. No new policy was created; no rulemaking occurred ...................................... 19

2. The Issue-Specific Method of determining disallowance amounts is reasonable and did not require a rulemaking proceeding. (Addresses ETI's Issue 3)........................................................................................24

    A. ETI's evidence did not allow for an exact accounting of actual costs..............25

    B. Quantification by proportion is neither novel nor outside Commission discretion.....................................................................................26

    C. No new standard was imposed; no rulemaking was required..........................29

3. The Commission properly disallowed depreciation expenses of an ETI affiliate company. (Addresses ETI's Issue 4) ........................................................30

PRAYER ........................................................................................34

CERTIFICATE OF COMPLIANCE ...............................................................36

CERTIFICATE OF SERVICE.......................................................................36

APPENDICES .......................................................................................38

iii

# INDEX OF AUTHORITIES

**Cases**

*Butnaru v. Ford Motor Co.*, 84 S.W.3d 198 (Tex. 2002)..................................................6, 7

*Cent. Power & Light Co. v. Pub. Util. Comm'n*, 36 S.W.3d 547
(Tex. App.—Austin 2000, pet. denied). ........................................................ 32

*City of Amarillo v. R.R. Comm'n*, 894 S.W.2d 491 (Tex. App.—
Austin 1995, writ denied). ..........................................................................25, 32

*City of El Paso v. Pub. Util. Comm'n*, 344 S.W.3d 609 (Tex. App.—
Austin 2011, no pet.).......................................................................................... 2

*City of El Paso v. Pub. Util. Comm'n*, 883 S.W.2d 179 (Tex. 1994).........................passim

*City of El Paso v. Pub. Util. Comm'n*, 916 S.W.2d 515 (Tex. App.—
Austin 1995, writ dism'd by agr.)..................................................................... 9

*El Paso Hosp. Dist. v. Tex. Health & Human Servs. Comm'n*,
247 S.W.3d 709 (Tex. 2008) ........................................................................... 20

*Entergy Gulf States, Inc. v. Public Utility Comm'n*, 173 S.W.3d 199
(Tex. App.—Austin 2005, pet. denied) .......................................................23, 30

*Entergy Tex., Inc. v. Pub. Util. Comm'n*, No. D-1-GN-13-002623
(345th Dist. Ct., Travis County, Tex. Oct. 10, 2014) ......................................vii

*Gerst v. Nixon*, 411 S.W.2d 350 (Tex. 1966) ........................................................................ 7

*Hinkley v. Tex. State Bd. Of Med. Exam'rs*, 140 S.W.3d 737
(Tex. App.—Austin 2004, pet. denied) ............................................................ 7

*Indus. Utils. Serv., Inc., et al., v. Tex. Natural Res. Conservation Comm'n*,
947 S.W.2d 712 (Tex. App.—Austin 1997, writ denied)......................................10, 15

*Nucor Steel v. Pub. Util. Comm'n*, 168 S.W.3d 260
(Tex. App.—Austin 2005, no pet.) ..............................................................7, 28

*Oncor Electric Delivery Co., LLC v. Pub. Util. Comm'n*,
406 S.W.3d 253 (Tex. App.—Austin 2013, no pet.)........................................18, 19

*Pedernales Elec. Coop. v. Pub. Util. Comm'n*, 809 S.W.2d 332
(Tex.App.—Austin 1991, no writ).). ..................................................... 28

*Pioneer Natural Res. USA, Inc. v. Pub. Util. Comm'n*, 303 S.W. 3d 363
(Tex. App.— Austin 2009, no pet.). ...................................................... 9, 27

*Pub. Util. Comm'n v. Gulf State Utils. Co.*, 809 S.W.2d 201 (Tex. 1991) ......................... 7

*R.R. Comm'n v. Rio Grande Valley Gas Co.,* 683 S.W.2d 783
(Tex. App.—Austin 1984, no writ). .......................................................... 32

*R.R. Comm'n v. WBD Oil & Gas Co.*, 104 S.W.3d 69 (Tex. 2003)................................. 20

*Reliant Energy, Inc. v. Pub. Util. Comm'n*, 153 S.W.3d 174
(Tex. App.—Austin 2004, pet. denied) ................................................... 7, 16

*Sec. & Exch. Comm'n v. Chenery Corp.*, 332 U.S. 194 (1947) ................................ 24, 30

*State Bd. of Ins. v. Deffebach*, 631 S.W.2d 794
(Tex. App.—Austin 1982, writ ref'd n.r.e.)............................................... 24, 30

*State v. Thomas*, 766 S.W.2d 217 (Tex. 1989)................................................... 1

*Tex. Health Facilities Comm'n v. Charter Med.-Dall., Inc.*,
665 S.W.2d 446 (Tex. 1984) ................................................................. 7

*Tex. State Bd. of Pharmacy v. Witcher,* 447 S.W.3d 520
(Tex. App.—Austin 2014, pet. filed)...................................................... 21, 22

**Statutes**

PURA § 36.006............................................................................ 8, 25

PURA § 36.051......................................................................... 8, 22, 31

PURA § 36.058............................................................................... 32

PURA § 36.061(b)(2) .................................................................. 8, 17, 22, 31

Tex. Gov't Code § 2001.174 (West 2008) ...................................................... 6, 7

Tex. Gov't Code. § 2001.003(6)(A) (West 2008) ................................................. 20

Tex. Util. Code §§ 11.001–66.016 (West 2007 & Supp. 2014) ......................................... 8

**Other Authorities**

*Application of AEP Texas Central Company for Authority to Change Rates*, PUC Docket No. 28840 (2003) ...................................................................................... 12

*Application of Entergy Texas, Inc. for Authority to Change Rates, Reconcile Fuel Costs, and Obtain Deferred Accounting Treatment*, Docket No. 39896 ...................... 11

*Proceeding to Consider Rate Case Expenses Severed from Docket No. 28840 (Application of AEP Texas Central Company for Authority to Change Rates)*, Docket No. 31433, Order at 3 (March 3, 2006) ............................................................ 15

**Rules**

16 Tex. Admin. Code § 25.231 ....................................................................................... 2

16 Tex. Admin. Code § 25.231(a) ................................................................................. 31

16 Tex. Admin. Code § 25.245 ..................................................................................... 22

# **ISSUES PRESENTED**

The Public Utility Commission of Texas (PUC or Commission) denied recovery of some of the rate case expenses sought by Entergy Texas, Inc. (ETI or Entergy) in PUC Docket No. 40295. The Travis County District Court affirmed the PUC's decision in all respects.[1] ETI appeals the District Court's decision, giving rise to the following issues:

1) Did the Commission act within its discretion when it ordered that ETI could not recover from its ratepayers the cost of its unsuccessful attempt to reverse well-established Commission precedent regarding recovery of incentive compensation based on financial measures? (Addresses ETI's Issues 1 and 2.)

2) In the absence of evidence showing all of ETI's expenses related to the incentive compensation issue, did the Commission act reasonably in using an alternative method (an issue-specific reduction) to calculate the appropriate reduction of ETI's requested rate case expenses? (Addresses ETI's Issue 3.)

3) Did the Commission act reasonably and within its discretion when it determined that it was not reasonable for ETI to recover from its ratepayers an internal cost generally described as "depreciation and amortization"? (Addresses ETI's Issue 4.)

---

[1] *Entergy Tex., Inc. v. Pub. Util. Comm'n*, No. D-1-GN-13-002623 (345th Dist. Ct., Travis County, Tex. (Oct. 10, 2014); Final Judgment attached hereto as Appendix A.

## STATEMENT REGARDING ORAL ARGUMENT

State Agencies believe that the issues in this appeal are sufficiently straightforward and can be decided on the briefs alone. However, ETI seeks oral argument. If oral argument is granted, State Agencies request that its counsel be afforded a full opportunity to respond to oral arguments made to the tribunal by any or all parties who seek to overturn the district court's decision.

**No. 03-14-00706-CV**

_____

IN THE COURT OF APPEALS
FOR THE THIRD DISTRICT OF TEXAS
AUSTIN, TEXAS

_____

ENTERGY TEXAS, INC.,
*Appellant,*

v.

PUBLIC UTILITY COMMISSION OF TEXAS, ET AL.,
*Appellees.*

_____

Appealed from the 345th Judicial District Court of Travis County, Texas
The Honorable Amy Clark Meachum, Judge Presiding
Trial Court Cause No. D-1-GN-13-002623

_____

**BRIEF OF APPELLEE STATE AGENCIES**

Appellee State of Texas Agencies and Institutions of Higher Education (State Agencies)[2] provide this Brief on the Merits. Pursuant to Tex. R. App. Proc. 38.6(b), this Brief is timely filed. Herein, State Agencies respond to arguments made by Entergy Texas, Inc. (ETI or Entergy) regarding recovery of electricity ratemaking proceeding expenses (rate case expenses) from ratepayers. The Public

---

[2] State Agencies as customers of ETI and the PUC as a regulatory authority are each represented in this appeal by the Office of the Attorney General (OAG). State Agencies are represented by the OAG's Administrative Law Division, Energy Rates Section, while the Commission is represented by the Environmental Protection Division. *See State v. Thomas*, 766 S.W.2d 217 (Tex. 1989).

1

Utility Commission of Texas (Commission or PUC) properly disallowed recovery of certain rate case expenses requested by ETI. Appellant ETI opposes the Commission's disallowance; State Agencies support the Commission's decision in its entirety. State Agencies respectfully request that this Court affirm the judgment of the district court dated October 10, 2014.

## STATEMENT OF FACTS

The Statement of Facts provided by Appellant is generally accurate. State Agencies agree, for example, that ETI is an investor-owned electric utility, subject to traditional rate regulation. ETI's description of a utility's revenue requirement is accurate, but incomplete: revenue requirement, or cost of service, is comprised of the sum of the utility's *reasonable* expenses and a *reasonable* return on investment.[3] These modifiers, omitted in ETI's statement, are essential to the issues in this case.

Additionally, State Agencies agree with ETI's procedural history of the underlying rate case, Docket No. 39896, and the severance of rate case expenses into Docket No. 40295, the final order of which is being appealed here.

Facts Omitted. ETI's statement of facts provides ample information about Docket No. 39896, ETI's rate case, but omits pertinent details about the rate case

---

[3] *City of El Paso v. Pub. Util. Comm'n*, 344 S.W.3d 609, 613 (Tex. App.—Austin 2011, no pet.); 16 Tex. Admin. Code § 25.231.

expenses proceeding underlying this appeal, Docket No. 40295. In its rate case, ETI requested a $104.8 million annual base rate increase; the Commission approved $27.7 million of that request, a reduction of nearly 75%.[4] In the severed expenses case, ETI sought to recover $8,752,545 in rate case costs associated with Docket No. 39896, plus carrying charges. Of that total, $7,635,236 was incurred by ETI and $1,117,309 was incurred by cities in Entergy's service area (Cities).[5] Thus, the $7.6 million in rate case expenses sought by ETI, exclusive of the Cities' share, is more than one-fourth of the $28 million ETI was awarded as an annual base rate increase. As the Commission noted in its final order, "[t]he amount of rate-case expenses sought by ETI ($8.8 million) is high, both in absolute terms, and in relation to the rate increase ultimately obtained by ETI in Docket No. 39896 ($27.7 million)."[6]

Incorrect Statements. The Commission's final order was based on a Proposal for Decision (PFD) issued by the Administrative Law Judge (ALJ) who presided over the hearing on the merits in Docket No. 40295.[7] With respect to quantification

---

[4] AR Vol. I, Binder 2, Item 55 (Final Order) at Findings of Fact (FOF) No. 10 and 12 (Appendix B).

[5] Cities of Anahuac, Beaumont, Bridge City, Cleveland, Conroe, Dayton, Groves, Houston, Huntsville, Montgomery, Navasota, Nederland, Oak Ridge North, Orange, Pine Forest, Pinehurst, Port Arthur, Port Neches, Rose City, Shenandoah, Silsbee, Sour Lake, Splendora, Vidor, and West Orange.

[6] AR Vol. I, Binder 2, Item 55 (Final Order) at 5, FOF No. 17.

[7] AR Vol. I, Binder 2, Item 32 (Proposal for Decision) (Appendix C).

3

of disallowance, ETI states, "The ALJ did not attempt to quantify the actual expenses ETI incurred in its effort to recover this compensation, but instead used a proxy for that amount."[8] State Agencies disagree. In fact, the ALJ was not provided with enough data to quantify actual amounts spent on the incentive compensation issue, because none of ETI's internal costs was associated with a specific issue in the case.[9] Therefore, it is incorrect to state, "the ALJ did not attempt to quantify."

## SUMMARY OF THE ARGUMENT

ETI is seeking to overturn the Commission's reasoned decision to disallow ETI's recovery of certain rate case expenses. The Commission's disallowance of incentive compensation based on financial measures was reasonable and supported by substantial evidence. The Commission has broad discretion to disallow rate case expenses it deems were unreasonably incurred. Commission precedent that financial-based incentive compensation is not recoverable from ratepayers is unambiguous, and ETI was aware of that precedent. As such, ETI's arguments against long-standing Commission policy were rightfully deemed unreasonable.

The Commission's disallowance of expenditures to propound ETI's unreasonable argument was also reasonable and within its discretion. The

---

[8] Appellant's Br. 8.

[9] AR Vol. III, Transcript at 35 and 49; AR Vol. II, Binder 3, State's Ex. No. 4 (ETI Response to Request for Information).

4

Commission has previously disallowed rate case expenses for unreasonable rate case arguments. Previous cases in which utilities recovered rate case expenses for unsuccessfully arguing the same issue actually show the pattern that should have alerted ETI to the futility of repeatedly asserting the argument. No new standard was applied; the Commission's conventional reasonableness standard was the basis for disallowance of the expenses.

The Commission's quantification of the disallowance for ETI's unreasonable pursuit of a foregone issue was also well within reason. ETI failed to provide sufficient evidence documenting its expenses for the Commission to determine exact costs spent on the issue. With such evidence lacking, the Commission was forced to utilize an alternate method to determine the appropriate amount to disallow. The use of a proportional calculation to determine expenses was not unprecedented and resulted from reasoned consideration of relevant facts and factors. Use of the quantification method does not amount to imposition of a new standard, either. As such, the issue was properly addressed in the contested case setting.

Lastly, the Commission's denial of ETI's request to recover depreciation expenses of its affiliate company was proper. ETI did not provide sufficient evidence to prove that the expenses were recoverable pursuant to Commission

precedent or that the expenses were reasonably incurred to participate in the ratemaking proceeding.

In all respects, the Commission's decision was within its discretion, reasoned, and supported by substantial evidence. The district court correctly affirmed the Commission's decision and its judgment should be affirmed in its entirety.

## STANDARD OF REVIEW

ETI challenges the district court's decision on the basis that the Commission's decision was arbitrary and capricious and an abuse of discretion.[10]

The Texas Supreme Court has articulated indicators of agency actions that are arbitrary and capricious or constitute an abuse of discretion. An administrative agency's decision "is arbitrary or results from an abuse of discretion if the agency: (1) failed to consider a factor the legislature directs it to consider; (2) considers an irrelevant factor; or (3) weighs only relevant factors that the legislature directs it to consider but still reaches a completely unreasonable result."[11] Similarly, an abuse of discretion is characterized by unreasonable or arbitrary actions without reference to guiding rules or principles.[12]

---

[10] Appellant's Br. 10-12; Tex. Gov't Code § 2001.174 (West 2008).

[11] *City of El Paso v. Pub. Util. Comm'n*, 883 S.W.2d 179, 184 (Tex. 1994).

[12] *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 211 (Tex. 2002).

6

This Court has recognized an agency's decision will be deemed arbitrary if its "order denies parties due process of law or when it fails to follow the clear, unambiguous language of its own regulations."[13]

Substantial evidence review is utilized to analyze both arbitrary and capricious and abuse of discretion challenges.[14] "An administrative decision is generally not arbitrary and capricious if it is supported by substantial evidence."[15] Where some evidence supports a decision, no abuse of discretion occurred.[16]

Substantial evidence review "affords great deference to the Commission's decisions on topics that the legislature has determined are within the agency's discretion,"[17] such as rate case expenses. In an appeal concerning the propriety of an order issued by the Public Utility Commission, "findings, inferences, conclusions, and decisions . . . are presumed to be supported by substantial evidence, and the burden is on the contestant to prove otherwise."[18]

---

[13] *Reliant Energy, Inc. v. Pub. Util. Comm'n*, 153 S.W.3d 174, 199 (Tex. App.—Austin 2004, pet. denied) (citation omitted) (citing *Pub. Util. Comm'n v. Gulf State Utils. Co.*, 809 S.W.2d 201, 207 (Tex. 1991)).

[14] Tex. Gov't Code § 2001.174 (West 2008).

[15] *Hinkley v. Tex. State Bd. of Med. Exam'rs*, 140 S.W.3d 737, 743 (Tex. App.—Austin 2004, pet. denied) (citing *Gerst v. Nixon*, 411 S.W.2d 350, 354 (Tex. 1966)).

[16] *Butnaru*, 84 S.W.3d at 211.

[17] *Nucor Steel v. Pub. Util. Comm'n*, 168 S.W.3d 260, 267 (Tex. App.—Austin 2005, no pet.).

[18] *City of El Paso*, 883 S.W.2d at 185 (citing *Tex. Health Facilities Comm'n v. Charter Med.-Dall., Inc.*, 665 S.W.2d 446, 453 (Tex. 1984)).

## ARGUMENT AND AUTHORITIES

The district court correctly ruled that ETI's challenges are unsubstantiated. Rather than arbitrary and capricious, the Commission's decision is supported by substantial evidence and reasoned consideration of all relevant facts and factors. No action taken by the Commission in this matter overstepped the reasonable bounds of the discretion granted to it by the legislature.

**1. The Commission's disallowance of expenses incurred advocating for financial-based incentive compensation was reasonable and supported by substantial evidence. (Addresses ETI's Issues 1 and 2)**

**A. The Commission has broad discretion to disallow expenses that it determines are unreasonable.**

The Public Utility Regulatory Act (PURA)[19] requires that the Commission set a utility's rates based on a reasonable return on invested capital plus "the utility's reasonable and necessary operating expenses."[20] The Commission may include a utility's reasonable costs of participating in a ratemaking proceeding in its recoverable operating expenses.[21] The utility bears the burden of proving that requested costs are reasonable.[22] This Court has recognized that "[t]he Commission

---

[19]  Tex. Util. Code §§ 11.001–66.016 (West 2007 & Supp. 2014).

[20]  PURA § 36.051.

[21]  PURA § 36.061(b)(2).

[22]  PURA § 36.006.

. . . has broad discretion to determine which requested expenses should be allowed."[23]

In pertinent part, the Commission is tasked with disallowing costs not proved to have been reasonably incurred within rate cases themselves. If the "Commission determines that a utility failed to prove the reasonableness of certain expenses incurred during the rate-making proceeding, the Commission may deny reimbursement of those rate case expenses."[24] This Court has agreed that even though there is no statutory or case law definition of "reasonable" as used in the rate case expenses statute, the Commission's discretion to approve fees should be upheld when there is substantial evidence in the record to support its determination.[25]

This Court has also held that the manner or substance of an argument pursued in a utility rate case, if unreasonable, can render expenses arising from that dispute unrecoverable. For example, "[t]he Commission has not only the discretion, but the duty, to ensure that rates charged to public utility customers do *not* include expenses incurred in seeking [recovery] that the utility's own evidence

---

[23] *City of El Paso v. Pub. Util. Comm'n*, 916 S.W.2d 515, 522 (Tex. App.—Austin 1995, writ dism'd by agr.)

[24] *Pioneer Natural Res. USA, Inc. v. Pub. Util. Comm'n*, 303 S.W. 3d 363, 376 (Tex. App.—Austin 2009, no pet.).

[25] *City of El Paso*, 916 S.W.2d at 522-23.

disfavors."[26] Senseless behavior in rate cases wastes resources and is not necessary to provide service or to participate in ratemaking proceedings.[27]

Thus, the Commission's decisions that: (1) ETI acted unreasonably in pursuing an argument contrary to long-standing precedent; and (2) ratepayers should not have to foot the bill for that unreasonable behavior, were entirely within the Commission's discretion.

## B. The Commission's finding that ETI was unreasonable to expend resources on the incentive compensation issue was reasonable and supported by substantial evidence.

The Commission found that ETI was unreasonable to argue in Docket No. 39896 that ratepayers should pay for Entergy's financial-based incentive compensation expenses. ETI claims that this decision is arbitrary and capricious because the Commission's previous decisions were unclear on the differentiation between financial-based and operational-based incentive compensation.[28]

Commission precedent is unequivocal. The Commission has been clear and consistent with its policy that incentive compensation tied to financial measures cannot be recovered, but incentive compensation tied to operational measures

---

[26] *Indus. Utils. Serv., Inc., v. Tex. Natural Res. Conservation Comm'n*, 947 S.W.2d 712, 716 (Tex. App.—Austin 1997, writ denied) (TNRCC, predecessor to the Texas Commission on Environmental Quality, is a sister agency of the PUC's that also regulates public utilities.).

[27] *Id.*

[28] Appellant's Br. 14.

can.[29] Further, when deciding whether incentive compensation is recoverable through a utility's rate base, Commission decisions consistently articulate that the "proper question to be asked is whether they provide benefits most immediately or predominantly to shareholders."[30]

ETI claims it was reasonable to seek recovery of financial-based incentive compensation expenses in spite of the unequivocal Commission precedent because Entergy perceived a lack of clarity in previous PUC decisions about how to differentiate between financial- and operational-based incentive compensation. However, in Docket No. 39896, ETI did not seek to clarify this alleged mystery. Rather, Entergy requested that it be allowed to recover *all* of its incentive compensation costs, regardless of type.[31] Its arguments centered on the ways in which financial-based incentive compensation benefits customers.[32] ETI's

---

[29] AR Vol. I, Binder 2, Item 55 (Final Order) at 2.

[30] *Application of Entergy Texas, Inc. for Authority to Change Rates, Reconcile Fuel Costs, and Obtain Deferred Accounting Treatment*, Docket No. 39896, Proposal for Decision at 171 (July 6, 2012) and Final Order at 17, FOF 61 (Sept. 14, 2012). In Appellant's Brief, page 4, footnote 10, ETI noted that the ALJ in the docket underlying this appeal took official notice of the record in Docket No. 39896. ETI then referred the court to the Commission's interchange to access all "public filings in Docket No. 39896 and other Commission dockets." This reference is inappropriate, as the interchange includes documents and information beyond what was ultimately entered into each docket's administrative record. The ALJ in Docket No. 40295 took official notice of the **record** in Docket No. 39896, not the entire docket. *See* AR Vol. III, Trans. of Hearing on the Merits at 16). Proper reference should have been made only to the administrative record as finalized by SOAH in Docket No. 39896.

[31] Appellant's Br. 6 (Statement of Facts).

[32] Appellant's Br. 5 (Statement of Facts).

11

witnesses discussed incentive compensation as an undivided category;[33] they did not attempt to elucidate "the division between the two types."[34] ETI's arguments indicate it was not confused about the Commission's precedent so much as it was dismissive of it.

Similarly, ETI asserts that determining whether a certain program is financial- or operational-based is a fact issue. Again, ETI presented no facts regarding how its incentive compensation programs should be categorized. Instead, it presented testimony of a general nature addressing how all financial-based incentive compensation should be recoverable.

In an attempt to prove Commission inconsistency, ETI points to the fact that ETI persuaded the Commission to include incentive compensation based on cost-control in Entergy's rate base, which the PUC had previously denied another utility.[35] This example is not on point. The Commission did not have long-standing policy to disallow cost-control incentive compensation, as it does with financial-based incentive compensation. ETI refers to a single proceeding in which cost-control incentive compensation was denied, Commission Docket No. 28840.[36] In

---

[33] Docket No. 39896, ETI Ex. 36 (Gardner Direct at 31) and ETI Ex. 15 (Hartzell Direct at 3-4, 6, 9-10).

[34] Appellant's Br. 14.

[35] Appellant's Br. 14.

[36] *Application of AEP Texas Central Company for Authority to Change Rates*, PUC Docket No. 28840 (2003).

that docket, the Commission denied AEP Texas Central Company recovery of its cost-control incentive compensation because the utility lumped its cost-control measures in with its financial-based measures, which were unrecoverable pursuant to long-standing PUC policy.[37] Recovering incentive compensation based on cost-control measures in Docket No. 39896 does not equate to challenging well-established Commission precedent, and it does not render reasonable a litigation practice of tilting at windmills.

ETI's argument that it was reasonable to argue the incentive compensation issue because of inconsistent Commission decisions on the issue fails. The record shows that Commission precedent on this issue is clear.[38] Evidence also shows that ETI was fully aware of this precedent,[39] despite its recent claims of uncertainty. This was the third rate case in a row in which ETI itself sought recovery of financial-based incentive compensation and lost the issue,[40] and all parties agreed that precedent mandated that recovery be denied.[41]

---

[37]  *Id*. Final Order (Aug. 15, 2005).

[38]  AR Vol. I, Binder 2, Item 55 (Final Order) at 2 n.6, which cites multiple PUC proceedings denying recovery of financial-based incentive compensation expenses since 2005.

[39]  AR Vol. I, Binder 2, Item 32 (Proposal for Decision) at 21 ("In Docket 39896, all parties, including ETI, agreed that Commission precedent mandated that financially-based incentive compensation is not recoverable."); Docket No. 39896, ETI Ex. 36, Gardner Direct at 29-30.

[40]  AR Vol. I, Binder 1, Item 23 (Initial Br. of State Agencies) at 7 (referring to Docket Nos. 34800 and 37744).

[41]  AR Vol. I, Binder 2, Item 32 (Proposal for Decision) at 21.

Based on this evidence, the ALJ stated, "ETI did not act reasonably when it incurred expenses litigating for recovery of its financially-based incentive costs in the face of clear and consistent precedent to the contrary on the issue."[42] Affirming the ALJ, the Commission stated: "reductions should be made to Entergy's recoverable rate-case expenses for Entergy attempting to recover financially-based incentive compensation in base rates."[43]

The Commission's finding that ETI acted unreasonably in presenting argument about financial-based incentive compensation resulted from a thorough consideration of relevant facts and factors, was not patently unreasonable and was supported by substantial evidence.

On this issue the lower court should be affirmed.

## C. Having properly determined ETI's argument was unreasonable, the Commission's disallowance of expenses arising therefrom was proper.

ETI contends that the disallowance for the expenses associated with litigating the foregone financial-based incentive compensation issue was arbitrary and capricious and an abuse of discretion.

---

[42]  *Id*. at 24.

[43]  AR Vol. I, Binder 2, Item 55 (Final Order) at 2.

### i. Disallowance of expenses unreasonably incurred is consistent with previous Commission actions

Entergy's complaint that the Commission has never before made such a disallowance is only accurate where an incredibly narrow category of "such a disallowance" is drawn. The Commission disallowed recovery of ETI's expenses "due to an unreasonable position pursued by Entergy in the rate case."[44] The PUC has disallowed rate case expenses for unreasonable litigation strategies before. For example, in Docket No. 31433, the Commission disallowed expenses for a utility's use of an expert witness whose work product was "seriously flawed."[45]

This court has upheld the disallowance of such costs in a similar situation faced by a sister agency of the PUC, the Texas Natural Resources Conservation Commission (TNRCC). In *Industrial Utilities Service, Inc. v. Texas Natural Resources Conservation Commission*,[46] a utility challenged a TNRCC decision disallowing costs incurred when the utility took an unreasonable litigation position in a surcharge matter.[47] Though the fact situations were not identical, TNRCC did, as the PUC did in Docket No. 31433 and here, assess the propriety of legal

---

[44] AR, Vol. I, Binder 2, Item 55 (Final Order at 2).

[45] *Proceeding to Consider Rate Case Expenses Severed from Docket No. 28840 (Application of AEP Texas Central Company for Authority to Change Rates)*, Docket No. 31433, Order at 3 (March 3, 2006) (Appendix D).

[46] 947 S.W.2d 712 (Tex. App.—Austin 1997, pet. denied).

[47] *Id.* at 716.

arguments made and determine those arguments were not reasonably propounded. In all cases, the associated costs were properly disallowed.

ETI further argues that because it and other utilities have previously recovered expenses incurred advocating for financial-based incentive compensation recovery, it is arbitrary and capricious to deny ETI that same recovery. However, the premise that the Commission's different treatment of other utilities in other cases necessarily means ETI's treatment here has been arbitrary and capricious is inaccurate.[48] "In short, regardless of the Commissions actions in other cases . . . we must assess the reasonableness of the treatment of [the utility] . . . in *this* case."[49]

Moreover, in each case cited by ETI to show it was treated differently, the Commission disallowed recovery of financial-based incentive compensation from ratepayers. With each successive decision denying companies' attempts to recover the requested expenses in rate bases, the relitigation of the issue with expectations of different results became less reasonable. So, the Commission's decisions in other rate cases actually show how ETI, rather than the Commission, acted unreasonably on this issue.

---

[48] *Reliant Energy*, 153 S.W.3d at 200.

[49] *Id.*

16

## ii. No new standard was applied.

Entergy also claims that the disallowance was arbitrary and capricious because it imposed a new standard at the end of an administrative proceeding. No new standard was created here. The standard is and has always been that rate case expenses are only recoverable through the rate base if they were reasonably incurred to participate in the proceeding.[50]

The fact that no new standard was created is evident in the fact that ETI has not been able to articulate a clear and consistent statement of the "new policy." ETI first states that the Commission declared it unreasonable to incur expenses to litigate financial-based incentive compensation.[51] Alternatively, and more generally, it defines the new policy as precluding a utility from "recovering expenses of arguing against a decision in a prior Commission proceeding."[52] ETI also suggests that the Commission's "new policy" addressed "rate case expenses related to advocacy of long-shot positions."[53] However, the Commission's declaration was in fact more specific: it reduced *ETI's* recoverable expenses "due

---

[50]  PURA § 36.061(b)(2).

[51]  Appellant's Br. 19.

[52]  Appellant's Br. 24

[53]  Appellant's Br. 18 (quoting Chairman Nelson).

to an unreasonable position pursued *by Entergy* in the rate case."[54] The Commission's findings of fact also specifically addressed ETI's behavior: "unreasonable and overly aggressive arguments pursued *by ETI*."[55] Thus, rather than creating a new standard, the Commission applied the facts of this case to the same standard it has been using for rate case expenses all along.

ETI relies heavily on *Oncor Electric Delivery Company, LLC v. Public Utility Commission*[56] to establish fundamental unfairness of applying a new standard retroactively.[57] In *Oncor*, the Commission denied recovery of rate case expenses not because they were unreasonable, but because prior authorization had not been obtained.[58] The reasonableness of the expenses was never challenged.[59] Instead, the Commission attempted to retroactively require prior Commission authorization to recover certain expenses that were otherwise reasonable. This Court ruled that the Commission was arbitrary and capricious when it implemented

---

[54] AR, Vol. I, Binder 2, Item 55 (Final Order) at 2 (emphasis added. This mirrored the ALJ's determination that "ETI did not act reasonably…."AR, Vol. I, Binder 2, Item 32 (Proposal for Decision) at 24.

[55] AR, Vol. I, Binder 2, Item 55 (Final Order) at 6, FOF 18.f and Item 32 (Proposal for Decision) at 38, FOF 18.f. (emphasis added).

[56] 406 S.W.3d 253 (Tex. App.—Austin 2013, no pet.)

[57] Appellant's Br. 19-21.

[58] *Oncor*, 406 S.W.3d at 258, 264.

[59] *Id*. at 271.

this "new requirement that would have required Oncor to take action years before the hearing."[60]

In contrast, the Commission has not added a condition to recovery of rate case expenses in this case; rather, the Commission applied its tried and true reasonableness standard to the fact situation before it, and found the rate case expenses unreasonably incurred. *Oncor* actually highlights the difference between imposition of a new standard and the Commission's action in its Docket No. 40295 Final Order. No fundamental unfairness arose from the Commission's application of a statutory reasonableness standard.

### iii. The Commission properly took action in a contested case hearing. No new policy was created; no rulemaking occurred.

ETI avers that the Commission's adoption of this "new policy" constitutes the promulgation of a rule and should have been completed through a rulemaking proceeding rather than in a contested case.

The PUC did not adopt a new rule in Docket No. 40295. ETI states that "it is indisputable that the Commission adopted a rule of general applicability in this case."[61] State Agencies disagree. "Rule" is defined in the Administrative Procedure Act (APA) as "a state agency statement of general applicability that: (i) implements, interprets, or prescribes law or policy; or (ii) describes the procedure

---

[60] *Id*. at 269.

[61] Appellant's Br. 21.

or practice requirements of a state agency."[62] "General applicability" is paramount: it "references 'statements that affect the interest of the public at large such that they cannot be given the effect of law without public input.'"[63] The Commission's order in Docket No. 40295 constituted a fact-based decision, rather than a generally applicable rule.

Entergy claims that no facts cited in the decision suggest this "new policy" applies only to this case.[64] However, the PFD, as adopted by the Commission, discusses exactly the facts that make this application of the reasonableness standard particular to this case.[65] For example, the ALJ explained, "all parties, including ETI, agreed that Commission precedent mandated that financially-based incentive compensation is not recoverable. Nevertheless, in its application, ETI asked the Commission to reconsider its precedents on the issue."[66] Additionally, "[i]t was obvious throughout the hearing in Docket No. 39896 that ETI was taking an aggressive position and making a 'long-shot' argument in seeking recovery for its financially-based incentive compensation."[67] The PFD also recounts the

---

[62] Tex. Gov't Code. § 2001.003(6)(A) (West 2008).

[63] *El Paso Hosp. Dist. v. Tex. Health & Human Servs. Comm'n*, 247 S.W.3d 709, 714 (Tex. 2008) (citing *R.R. Comm'n v. WBD Oil & Gas Co.*, 104 S.W.3d 69, 79 (Tex. 2003)).

[64] Appellant's Br. 21.

[65] AR Vol. I, Binder 2, Item 32 (Proposal for Decision) at 21-24.

[66] *Id*. at 21.

[67] *Id*. at 23.

insufficiency of ETI's evidence and argument on the issue.[68] It was these elements that made ETI's actions unreasonable and associated expenses unrecoverable. It is the same facts that point to the case-specific nature of the Commission's decision.

*Witcher* does not support ETI's case. ETI relies heavily on *Texas State Board of Pharmacy v. Witcher*[69] to bolster its improper rulemaking arguments.

In *Witcher*, this court addressed the issue of whether a certain statement of agency policy that formed the basis of a contested case decision was a rule or not.[70] In that case, the Pharmacy Board imposed a disciplinary action that was impossible for the plaintiff pharmacist, Witcher, to fulfill. The Board based the sanction on what it called a "'non-binding' policy, practice, or precedent,"[71] but claimed it could not discipline Witcher in a manner inconsistent with the policy. Witcher challenged the disciplinary action, claiming that in deciding her case, the Board relied on the policy as it would rely on a rule, despite the fact situation presented.[72] If the policy were so immutable, irrespective of case-specific facts, the plaintiff argued, the policy was actually a rule that should have been promulgated through

---

[68] *Id*. at 23-24 ("ETI cites to a number of cases…[that] hurt ETI's cause more than they help…." ETI selectively quoted Commissioner statements that appeared to support its argument, which the ALJ pointed out "overstates and distorts the facts.").

[69] 447 S.W.3d 520 (Tex. App.—Austin 2014, pet. filed).

[70] *Id*. at 527.

[71] *Id*.

[72] *Id*. at 525.

21

formal rulemaking.[73] This Court agreed, based on a finding that the agency's policy was being applied generally, without consideration of the circumstances in an individual case.[74]

The agency action alleged to be a rule here is a fact-specific decision in a contested case hearing, whereas in *Witcher*, it was an agency policy on which the Board based a contested case decision. The agency in *Witcher* created the policy underlying its disciplinary decision without a proper rulemaking process*;* here, in contrast, the "policy" on which the Commission's decision is based is the reasonableness standard found in PURA.[75] The PUC's decision in Docket No. 40295 is not ad hoc rulemaking, but an application of the statute to specific facts. This threshold distinction precludes inquiry into exceptions allowing ad hoc rulemaking. Therefore, *Witcher* supports the fact that the Commission did not create a rule when it issued its Final Order in Docket No. 40295.

Subsequent rulemaking is neither probative nor persuasive. Entergy asserts that the fact that a rulemaking project on rate case expenses was initiated soon after issuance of the decision in this matter[76] proves that the subject was appropriate for

---

[73]    *Id*.

[74]    *Id*. at 529-30.

[75]    PURA §§ 36.051, .061(b)(2).

[76]    Project No. 41622 was initiated by the Commission to address rate case expenses on June 27, 2013. This project resulted in a new substantive rule: 16 Tex. Admin. Code § 25.245, effective August 26, 2014.

rulemaking, and so the Docket No. 40295 final order promulgated a new rule. In fact, the opposite is true: the fact that a rulemaking occurred after the decision in this case means that the decision in this case did not constitute the creation of a new rule at all.

The fact that a rulemaking is initiated following a contested case also does not mean the question should not have been addressed in the contested case. ETI should know this well. *Entergy Gulf States, Inc. v. Public Utility Commission*[77] concerned section 36.203 of the Utility Code, addressing Fuel Cost Recovery ("the fuel rule"). In that case, the Commission applied the fuel rule in a manner that Entergy Gulf States claimed departed from its previous decisions.[78] Thereafter, the Commission initiated a rulemaking and solicited comments from the public on the application of the fuel rule. Entergy Gulf States argued that the subsequent request for public comment was "tantamount to the Commission admitting that it must engage the formal rulemaking process to modify the fuel rule" as it did.[79] This Court disagreed, stating, "the Commission may consider a matter in a contested case before adopting a rule later."[80] This Court has further affirmed such agency

---

[77] 173 S.W.3d 199 (Tex. App.—Austin 2005, pet. denied).

[78] *Id*. at 211.

[79] *Entergy Gulf States*, 173 S.W.3d at 212.

discretion: "[u]nless mandated by statute, the choice by an agency to proceed by general rule or by ad hoc adjudication is one that lies primarily in the informed discretion of the agency."[81]

The Commission's decision in Docket No. 40295 did not promulgate a new standard. Instead, it was a fact-specific application of the law in effect at that time. It was within the Commission's discretion and supported by substantial evidence. The disallowance based on ETI's pursuit of an unreasonable argument was appropriately addressed in a contested case hearing, and it was supported by substantial evidence. Therefore, the district court judgment on this issue should be affirmed.

## 2. The Issue-Specific Method of determining disallowance amounts is reasonable and did not require a rulemaking proceeding. (Addresses ETI's Issue 3)

ETI challenges the Commission's quantification of the expenses disallowed as a result of Entergy's unreasonable rate case actions as arbitrary and capricious and an abuse of discretion. Entergy claims that the Commission has never before used issue-specific measures to quantify a disallowance, and that the Commission

---

[80] *Id*. at 212; see also *City of El Paso*, 883 S.W.2d at 189 ("ad hoc adjudication may be preferable to a formal rulemaking proceeding where 'the agency may not have had sufficient experience with a particular problem to warrant rigidifying its tentative judgment into a hard and fast rule.").

[81] *State Bd. of Ins. v. Deffebach*, 631 S.W.2d 794, 799 (Tex. App.—Austin 1982, writ ref'd n.r.e.) (citing *Sec. & Exch. Comm'n v. Chenery Corp.*, 332 U.S. 194 (1947)).

engaged in improper ad hoc rulemaking when it imposed a new standard at the end of a contested case.

## A. ETI's evidence did not allow for an exact accounting of actual costs.

While some of ETI's expenses specific to the financial-based incentive compensation issue were documented, ETI did not provide adequate evidence to determine the exact total cost of litigating that topic.[82] It is ETI's burden to prove its rate case expenses were reasonable.[83] ETI's failure to adequately quantify its exact expenses does not lead to a partial disallowance consisting of only the calculable amounts, as ETI would suggest. Instead, the ALJ and the Commission were forced to find an alternative way of calculating the appropriate disallowance. A commission's "function as the ultimate arbiter of 'reasonableness' would be nugatory if it were unable to exact a satisfactory accounting from those seeking reimbursement for rate case expenses."[84] In the absence of satisfactory accounting, quantification by an alternate method was well within the Commission's discretion as the ultimate arbiter.

---

[82] AR Vol. I, Binder 2, Item 32 (Proposal for Decision) at 24.

[83] PURA § 36.006.

[84] *City of Amarillo v. R.R. Comm'n*, 894 S.W.2d 491, 497 (Tex. App.—Austin 1995, writ denied).

**B. Quantification by proportion is neither novel nor outside Commission discretion.**

In testimony, parties offered and provided recommendations on three methods for calculating the amount that should be disallowed on the financial-based incentive compensation issue.[85] After consideration of all three methods, the ALJ chose,[86] and the Commission adopted,[87] what is referred to as the "Issue-Specific" Method of quantifying disallowance.[88] Under this approach, requested rate case expenses were reduced by the ratio of the amounts unsuccessfully sought by ETI for financially-based incentive payments to the entire rate increase sought by ETI.[89] The resulting disallowance of rate case expenses on this issue was $522,244.66.[90]

This utilization of a proportion calculation was also well within the Commission's discretion. The Commission has previously used similar methods for calculating amounts that are not explicitly addressed in a statute.[91] "[E]ven

---

[85] AR, Vol. II, Binder 3 OPUC Ex. 1 (Direct Testimony of Nathan Benedict) at 10-11; Vol. I, Binder 1, Item 23 (Init. Br. of State Agencies) at 3, 22; Vol. I, Binder 1, Item 22 (OPUC Init. Br.) at 11; Vol. I, Binder 2, Item 24 (Comm'n Staff Init. Br.) at 12.

[86] AR Vol. I, Binder 2, Item 32 (Proposal for Decision) at 29-30.

[87] AR Vol. I, Binder 2, Item 55 (Final Order) at 3.

[88] ETI refers to this as the "proxy method."

[89] AR Vol. I, Binder 2, Item 32 (Proposal for Decision) at 29.

[90] AR Vol. I, Binder 2, Item 55 (Final Order) at 3 and 6 (FOF 18.f.).

[91] Docket No. 31433, Order (March 3, 2006).

when no evidence suggests a specific figure explicitly, the Commission may infer the figure if it is supported by the body of evidence as to that issue."[92] Expert testimony provided a range of disallowance amounts that were reasonably calculated.[93] Where, as here, the record contains substantial evidence to support such a range and valuation of a disallowance is inherently complex, "there is a reasonable basis for the Commission to, in its discretion, select an amount within the range of figures provided by the expert testimony of the parties."[94] Thus, the chosen method of disallowance calculation was well within the Commission's discretion and reasonably decided.

In addition, quantification of the disallowance through the issue-specific method was anything but arbitrary and capricious. "The findings, inferences, conclusions, and decisions of an administrative agency are presumed to be supported by substantial evidence, and the burden is on the contestant to prove otherwise."[95] ETI has not carried this burden. The record shows that the Commission engaged in a "process of discussion, careful consideration, and

---

[92] *Pioneer Natural Res.*, 303 S.W. 3d at 369.

[93] AR Vol. II, Binder 3, OPUC Ex. 1 (Direct Testimony and Workpapers of Nathan Benedict) at 10-11.

[94] *City of El Paso*, 883 S.W.2d at 186.

[95] *Id.*

compromise,"[96] when it chose this method, which was supported by expert testimony.[97]

ETI claims the method is arbitrary because there is no relationship between the issue-specific method and the rate case expenses associated with the issue.[98] However, in its next sentence, Entergy explains that the relationship lies in the issues' values rather than their costs. This is a reasonable and logical relationship. It is sensible to assume that ETI would manage its expenditures, at least in part, based on the potential value that the outcome of each argument holds for it. Certainly, good business practices would not prescribe payment of exorbitant legal fees to defend a position that would result in a minimal amount of recovery. A disallowance calculation method that employs similar logic is reasonable.

Entergy claims that the Commission illogically applied the PURA provision that authorizes the Commission to entitle a utility to recover reasonably incurred rate case expenses.[99] However, "[t]he Commission is not required to grant recovery of every reasonable expense."[100] And, ETI has not proffered an explanation as to

---

[96] *Nucor Steel v. Pub. Util. Comm'n,* 168 S.W.3d 260, 269 (Tex.App.—Austin 2005, no pet.) (referencing earlier cite to *Pedernales Elec. Coop. v. Pub. Util. Comm'n,* 809 S.W.2d 332, 341 (Tex.App.—Austin 1991, no writ).).

[97] AR Vol. I, Binder 2, Item 32 (Proposal for Decision) at 21-24.

[98] Appellant's Br. 28.

[99] Appellant's Br. 29 (citing PURA § 36.061(b)).

[100] AR Vol. II, Binder 3, OPUC Ex. 1 at 4.

28

why any one amount within the suggested range is more reasonable or better supported than the amount chosen by the Commission.[101] Thus, ETI has failed to meet its burden showing that the issue-specific quantification method is arbitrary and capricious or an abuse of the Commission's discretion.

## C. No new standard was imposed; no rulemaking was required.

Lastly, ETI claims that imposing this "new standard" at the end of an administrative proceeding constitutes ad hoc rulemaking, and thus was arbitrary and capricious and an abuse of discretion.

Again, no new standard was imposed. There is no indication that the ALJ or the Commission intended for this decision to become generally applicable law. "The ALJ recommends adoption of the Issue-Specific Reduction Approach *in this case*."[102] In its order, the Commission affirmed "the use of the 'issue-specific reduction approach' to determine how to calculate an appropriate reduction," in this case.[103] The Commission did not adopt this approach as the only way to calculate appropriate reduction for all subsequent cases. The Commission only decided the particular issue at hand supported by the facts in this case.

The initiation of a rate case expenses rulemaking proceeding does not discredit the contested case decision. As explained above, the fact that a subject is

---

[101] *See City of El Paso*, 883 S.W.2d at 186.

[102] AR Vol. I, Binder 2, Item 32 (Proposal for Decision) at 32 (emphasis added).

[103] AR Vol. I, Binder 2, Item 55 (Final Order) at 2.

29

appropriate for rulemaking does not prohibit an agency from taking it up in the context of a contested case. It is within an agency's discretion to decide whether to take action through a rulemaking or directly in a contested case.[104] The district court judgment affirming the Commission's decision on this issue should be affirmed.

## 3. The Commission properly disallowed depreciation expenses of an ETI affiliate company. (Addresses ETI's Issue 4)

PURA allows a utility to recover depreciation of its capital investment property, if used to provide service, as an expense in calculating the utility's revenue requirement. In a curious and atypical application of this allowance, ETI seeks to include depreciation of assets (capital investments) belonging to its affiliate, Entergy Services, Inc. (ESI), in ETI's rate base as a rate case expense. The Commission disallowed $207,683 in these affiliate depreciation expenses, which ETI presented as "Depreciation & Amort" costs. The Commission's disallowance was based on the fact that ETI failed to: (1) cite to any precedent that would justify the recovery; (2) prove the reasonableness of the expenses under the more stringent affiliate standards; and (3) establish that it would similarly recover such an expense in an arms-length transaction with a non-affiliate.[105]

---

[104] *Entergy Gulf States*, 173 S.W.3d at 211-12; *Deffebach*, 631 S.W.2d at 799 (citing *Sec. & Exch. Comm'n v. Chenery Corp.*, 332 U.S. 194 (1947)).

[105] AR Vol. I, Binder 2, Item 32 (Proposal for Decision) at 12 and Item 55 (Final Order) at 2.

The Commission's disallowance of ESI's depreciation expenses was supported by substantial evidence and was not arbitrary and capricious. Contrary to ETI's assertions, the record shows both rational, consistent reasoning and evidentiary support for this disallowance.

ETI first argues the disallowance was unreasonable because similar expenses were deemed reasonable and necessary for inclusion in the rate base in the underlying rate case. The statutory standard for reasonable and necessary expenses is different in rate cases than it is in rate case expense cases.[106] Depreciation expense was included in ETI's revenue requirement only to the extent that it was based upon the "cost of rendering service to the public during a historical test year."[107] That is a different standard than what may be allowed as a rate case expense, which is tied by statute to what is reasonable to *participate* in a proceeding.[108]

ETI also asserts that the ALJ's statement that ETI "would not similarly recover such an expense in an arms-length transaction with an affiliated company,"[109] is completely unsupported by evidence in the record. However,

---

[106] PURA 36.051, compare with 36.061(b)(2).

[107] 16 Tex. Admin. Code § 25.231(a).

[108] PURA § 36.061(b)(2).

[109] AR Vol. I, Binder 2, Item 32 (Proposal for Decision) at 12.

31

ETI's omission of the first part of the referenced sentence is informative. The entire sentence reads:

> Simply put, *ETI has failed to establish* that it is entitled to recover a depreciation expense related to an affiliate transaction because it would not similarly recover such an expense in an arms-length transaction with an affiliated company.[110]

The burden of proof, again, was ETI's. As this court has previously recognized, "because of the possibility for self-dealing between affiliated companies, PURA regards affiliate transactions with some skepticism and requires the utility to meet a high burden of proof before costs paid to affiliated companies may be allowed as an expense."[111] Under the affiliate transaction standard, payments to affiliated companies are presumptively excluded from a utility's rate base or operating expenses unless the utility presents evidence supporting Commission findings that (1) each item or class of items is reasonable and necessary, and (2) the price charged is no higher than that charged to other affiliates, divisions, or unaffiliated entities.[112] Under this protective heightened scrutiny, ETI's evidence falls short of

---

[110] *Id.* (emphasis added).

[111] *Cent. Power & Light Co. v. Pub. Util. Comm'n*, 36 S.W.3d 547, 568-69 (Tex. App.—Austin 2000, pet. denied).

[112] PURA § 36.058; *see also City of Amarillo*, 894 S.W.2d at 498 ("Affiliate transactions are subject to this heightened scrutiny because when a utility and its suppliers are both owned and controlled by the same holding company, the safeguards provided by arm's-length bargaining are absent, and ever present is the danger that the utility will be charged exorbitant prices which will, by inclusion in its operating costs, become the predicate for excessive rates.") (citing PURA § 36.058 and *R.R. Comm'n v. Rio Grande Valley Gas Co.,* 683 S.W.2d 783, 786 (Tex. App.—Austin 1984, no writ).

meeting its burden of proof. This disallowance was not based on an unsupported assumption made by the ALJ, but instead on a reasoned analysis of ETI's evidence.

The evidence ETI offered on this issue is attached hereto as Appendix E. It consists of pages 1, 7, and 8 of ETI's Exhibit MPC-R-1 from Docket No. 40295. Pages 7 and 8 contain the sum total of documentation supporting the $207,863 in internal "Depreciation & Amort Expenses" summarized on page 1. The "detail" does not identify what assets depreciated, those assets' original cost, or how depreciation was calculated. No employees or assets were identified in ETI's exhibits or testimony, and underlying journal entries were not supplied. The "amortization" portion of the expense was never explained in either testimony or exhibits. Whether the claimed expense relates to assets used by ETI, ESI, or both is not detailed. A description of the assets' use with respect to the rate case is also lacking. In short, ETI simply failed to provide evidence to support its expenses, much less to determine if those expenses were reasonable.

Although ETI argues that this generalized cost relates in some fashion to ESI labor charges, there is no supporting calculation in this record that makes that connection. ETI presented no evidence that any outside contractors included depreciation in the rates billed to ETI. Actually, a standard outside vendor contract used by ETI's outside law firm indicates that the contrary is true.[113] It expressly

---

[113] AR Vol. III, Transcript at 55-56, concerning AR Vol. II, Binder 3, State's Ex. No. 15.

provides that charges related to computers, office facilities, word processing, which charges analogous to "desks, computers, copiers, office buildings, etc." are considered "unreimbursable overhead."[114]  The contract also states that copies are reimbursed at a set copy charge, and fees for word or document processing are not reimbursable.[115]

The ALJ determined that ETI did not present sufficient evidence of precedent or reasonableness to justify the recovery.[116] This determination is supported by substantial evidence in the record. As such, the district court's judgment affirming the Commission on this issue should be affirmed.

## **PRAYER**

The Commission's decisions to disallow expenses for financial-based incentive compensation, to quantify that disallowance using an issue-specific proportion method, and to disallow an affiliate's depreciation expenses were:

- within Commission discretion;
- reasonable results of logical consideration of all relevant facts and factors;
- supported by substantial evidence in the record; and
- properly addressed in a contested case rather than a rulemaking.

---

[114]  AR Vol. II, Binder 3, State's Ex. No. 15 at 3.

[115]  *Id*. at 4-5.

[116]  AR Vol. I, Binder 2, Item 32 (Proposal for Decision) at 12.

For these reasons and others set out above, the district court's final judgment was correct in affirming the Commission's decision.  State Agencies pray that the judgment be in all respects AFFIRMED.

**Dated:**  March 6, 2015

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

CHARLES E. ROY
First Assistant Attorney General

JAMES E. DAVIS
Deputy Attorney General for Civil Litigation

DAVID A. TALBOT, JR.
Chief, Administrative Law Division


*/s/ Sara R. Hammond*
Katherine H. Farrell
State Bar No. 24032396
Sara R. Hammond
State Bar No. 24081003
Assistant Attorneys General
OFFICE OF THE TEXAS ATTORNEY GENERAL
Administrative Law Division
P.O. Box 12548
Austin, Texas 78711
Telephone:  (512) 475-4173
Facsimile:  (512) 320-0167
E-mail:   katherine.farrell@texasattorneygeneral.gov
              sara.hammond@texasattorneygeneral.gov

***Counsel for Appellee State Agencies***

## CERTIFICATE OF COMPLIANCE

I certify that this document contains 7,572 words in the portions of the documents that are subject to the word limits of Texas Rules of Appellate Procedure 9.4(i), as measured by the undersigned's word processing software.

*/s/ Sara R. Hammond*
Sara R. Hammond
Assistant Attorney General

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the Brief of Appellee State Agencies was transmitted by electronic filing on the 6th day of March, to the parties of record as listed below:

**ENTERGY TEXAS, INC.,**

**Appellant**

John F. Williams
Marnie A. McCormick
DUGGINS WREN MANN & ROMERO, LLP
One American Center
600 Congress Suite 1900
Austin, Texas 78767
Telephone: (512) 744-9300
Facsimile: (512) 744-9399
jwilliams@dwmrlaw.com
mmccormick@dwmrlaw.com

**OFFICE OF PUBLIC UTILITY COUNSEL,**

**Appellee**

Ross Henderson
Assistant Public Counsel
OFFICE OF PUBLIC UTILITY COUNSEL
1701 N. Congress Avenue
Suite 9-180
P.O. Box 12397
Austin, Texas 78711-2397
Telephone: (512) 936-7500
Facsimile: (512) 936-7525  or 936-7520
ross.henderson@opuc.texas.gov


**PUBLIC UTILITY COMMISSION OF TEXAS,**

**Appellee**

Elizabeth Sterling
Assistant Attorney General
OFFICE OF THE ATTORNEY GENERAL
Environmental Protection Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Telephone: (512) 475-4152
Facsimile: (512) 320-0911
Elizabeth.Sterling@texasattorneygeneral.gov


**TEXAS INDUSTRIAL ENERGY CONSUMERS,**

**Appellee**

Rex D. Van Middlesworth
Benjamin Hallmark
THOMPSON KNIGHT, LLP
98 San Jacinto Blvd, Ste. 1900
Austin, Texas 78701
Telephone: (512) 469.6100
Facsimile: (512) 469.6180
rex.vanm@tklaw.com
benjamin.hallmark@tklaw.com


*/s/ Sara R. Hammond*
Sara R. Hammond
Assistant Attorney General

# **APPENDICES**

A   District Court's Final Judgment and Letter from Judge Meachum

B   Commission's Final Order, PUC Docket No. 40295

C   ALJ's Proposal for Decision, PUC Docket No. 40295

D   Commission's Final Order, PUC Docket No. 31433

E   Excerpts of Entergy's Exhibit MPC-R-1, PUC Docket No. 40295

APPENDIX A

**COPY**

Filed in The District Court
of Travis County, Texas

OCT 0 2 2014 MC

At_____3:55____P.M.

Amalia Rodriguez-Mendoza, Clerk

AMY CLARK MEACHUM
Judge
(512) 854-9305

HUETTE MERRELL
Staff Attorney
(512) 854-9895

GRACE MCGEE
Court Operations Officer
(512) 854-9319

**201ST DISTRICT COURT**
HEMAN MARION SWEATT
TRAVIS COUNTY COURTHOUSE
P. O. BOX 1748
AUSTIN, TEXAS 78767
FAX (512) 854-2268

ALICIA RACANELLI
Official Reporter
(512) 854-4028

MIRIAM CALDERON
Court Clerk
(512) 854-5833

October 2, 2014

Ms. Marnie A. McCormick
DUGGINS WREN MANN & ROMERO LLP
P.O. Box 1149
Austin, Texas 78767
   **VIA FAX: (512) 744-9399**

Mr. Rex VanMiddlesworth
Ms. Meghan Griffiths
ANDREWS KURTH LLP
111 Congress Avenue, Suite 1700
Austin, Texas 78701
   **VIA FAX: (512) 320-9292**

Mr. Ross W. Henderson
OFFICE OF PUBLIC UTILITY COUNSEL
P.O. Box 12397
Austin, Texas 78711
   **VIA FAX: (512) 936-7525**

Ms. Elizabeth Sterling
Assistant Attorney General
OFFICE OF THE ATTORNEY GENERAL
Environmental Protection Division
P.O. Box 12548
Austin, Texas 78711-2548
   **VIA FAX: (512) 320-0911**

Ms. Susan M. Kelley
Assistant Attorney General
OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548
Austin, Texas 78711-2548
   **VIA FAX: (512) 396-0674**

Re:  Cause No. D-1-GN-13-002623; *Entergy Texas, Inc. v. Public Utility
     Commission of Texas;* in the 345th Judicial District, Travis County, Texas.

Dear Counsel:

   After carefully considering the briefing, the administrative record, the pleadings and the arguments of counsel, the Court denies Entergy Texas, Inc.'s request to reverse the Commission's rulings. Therefore, this Court affirms the Commission's decision and denies all other relief requested by Plaintiffs.

Ms. Sterling, please prepare the order reflecting the above-ruling, circulate it to all counsel for approval as to form, and submit it to this Court for signature.

Sincerely,

Amy Clark Meachum
Judge, 201st District Court
Travis County, Texas

Original:  Amalia Rodriguez-Mendoza, District Clerk

Amalia Rodriguez-Mendoza
District Clerk, Travis County
Travis County Courthouse Complex
P.O. Box 679003
Austin, Texas 78767



DATE: October 22, 2014

RECEIVED

OCT 2 7 2014

AL

SUSAN M. KELLEY
P.O. BOX 12548
AUSTIN, TX 78711-2548

FINAL JUDGMENT

**D-1-GN-13-002623**

ENTERGY TEXAS INC
VS.
PUBLIC UTILITY COMMISSION OF TEXAS

You are hereby notified that the above order has been signed and entered OCTOBER 10, 2014 in the 345TH JUDICIAL DISTRICT COURT of Travis County Texas in the above numbered and entitled cause.

AMALIA RODRIGUEZ-MENDOZA,
District Clerk

L60 - 000042978                    D-1-GN-13-002623

                                                                    cj

# APPENDIX B



Control Number: 40295



Item Number: 90

Addendum StartPage: 0



PUC DOCKET NO. 40295
SOAH DOCKET NO. 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

APPLICATION OF ENTERGY           §      PUBLIC UTILITY COMMISSION
TEXAS, INC. FOR RATE CASE         §
EXPENSES PERTAINING TO PUC        §              OF TEXAS
DOCKET NO. 39896                  §

## ORDER

This Order addresses the rate-case expenses pertaining to Docket No. 39896,[1] Entergy Texas, Inc.'s last rate case. Entergy requested $8.8 million in rate-case expenses associated with Docket No. 39896—$7.6 million for Entergy's own rate-case expenses and $1.2 million for Cities' rate-case expenses. The proposal for decision in this docket was issued on February 19, 2013. In the proposal for decision, the ALJ recommended allowing Cities' rate-case expenses incurred through August 31, 2012, plus up to $75,800 in rate-case expenses as they are incurred after August 31, 2012. The ALJ also recommended that Entergy's rate-case expenses be reduced to account for Entergy taking certain positions in the rate case regarding financially-based incentive compensation and transmission equalization expenses. The Commission considered the proposal for decision at the April 11 and April 25, 2013 open meetings. The Commission adopts in part and reverses in part the proposal for decision, including findings of fact and conclusions of law.

### I.    Estimated Rate-Case Expenses

The Commission reverses the proposal for decision regarding Cities' $75,800 in estimated rate-case expenses to be incurred after August 31, 2012.[2] In Docket No. 37772, the Commission found that approving estimated rate-case expenses for two different parties representing Cities is not in the public interest and disallowed their recovery in the rate-case expense surcharge, but did not prohibit the Cities from seeking recovery of actual rate-case

---

[1] *Application of Entergy Texas, Inc. for Authority to Change Rates, Reconcile Fuel Costs, and Obtain Deferred Accounting Treatment*, Order on Rehearing, Docket No. 39896 (Nov. 2, 2012).

[2] Proposal for Decision at 4-8 (Feb. 19, 2013).

90

expenses in the utility's next rate case.[3] The Commission affirms that holding here: Cities cannot recover for estimated rate-case expenses in this docket, but may seek recovery in Entergy's next rate case. To reflect its determination on this issue, the Commission adds new finding of fact 16A, modifies conclusion of law 7, and adds new conclusion of law 10.

## II.    Proportional Reduction

The Commission affirms the proposal for decision regarding the need to reduce Entergy's recoverable expenses due to an unreasonable position pursued by Entergy in the rate case[4] and also affirms the use of the "issue-specific reduction approach" to determine how to calculate an appropriate reduction in rate-case expenses when the utility takes positions that are in conflict with Commission precedent.[5]

Specifically, the Commission agrees with the ALJ that reductions should be made to Entergy's recoverable rate-case expenses for Entergy attempting to recover financially-based incentive compensation in base rates. The Commission has repeatedly ruled that a utility cannot recover the cost of financially-based incentive compensation because financial measures are of more immediate benefit to shareholders and financial measures are not necessary or reasonable to provide utility services.[6] The Commission concludes that it should follow its well-established policy here.

However, the ALJ did not include all of the impacts attendant to the disallowance for incentive compensation.[7] To calculate the amount of the reduction in rate-case expenses related to financially-based incentive compensation, the Commission starts with Entergy's initial rate-

---

[3] *Application of Southwestern Electric Power Company for Rate Case Expenses Pertaining to Docket No. 37364*, Order at 1-2, Docket No. 37772 (Oct. 21, 2010).

[4] Proposal for Decision at 29-30.

[5] *Id.* at 32-34.

[6] *Application of AEP Texas Central Company for Authority to Change Rates*, Docket No. 28840, Proposal for Decision at 92-97, Findings of Fact Nos. 164-170, Order at 35 (Aug. 15, 2005); *Application of AEP Texas Central Company for Authority to Change Rates*, Docket No. 33309, Proposal for Decision at 116-121, Finding of Fact No. 82, Order on Rehearing at 12 (March 4, 2008); *Application of Oncor Electric Delivery Company, LLC, for Authority to Change Rates*, Docket No. 35717, Proposal for Decision at 96-100, Finding of Fact No. 93, Order on Rehearing at 22 (Nov. 30, 2009); and *Application of CenterPoint Electric Delivery Company, LLC, for Authority to Change Rates*, Docket No. 38339, Proposal for Decision at 66-67, Findings of Fact Nos. 81-83, Order on Rehearing at 22 (June 23, 2011).

[7] Docket No. 39896, Order on Rehearing at 5-6, 7-8 (Nov. 2, 2012).

case expense request, reduced by $208,494 in disallowances made by the ALJ[8] and affirmed by the Commission. The Commission further reduces this amount by an additional $522,244.66, which is the amount of rate-case expenses related to financially-based incentive compensation using the issue-specific reduction approach.

The Commission disagrees with the ALJ that Entergy's rate-case expenses should be reduced due to Entergy's request for transmission equalization (MSS-2 expenses).[9] Even though Entergy did not meet the burden of proof that the requested expenses were known and measureable changes to test-year expenses, the request for the MSS-2 expenses did not conflict with clear Commission precedent.

Accounting for these reductions, the Commission finds that rate-case expenses for ETI in the amount of $6,896,037.73 are reasonable and necessary. Consequently, the Commission is approving a total amount of $8,021,806.34 in allowable rate-case expenses in this docket.

To reflect its determinations on the proportional reduction issue, the Commission modifies finding of fact 18 and conclusion of law 9.

### III.　　Affiliate Payments

The Commission also finds that the price for Entergy's affiliate payments is not higher than the prices charged by the supplying affiliate for the same item or class of items to its other affiliates or divisions or a nonaffiliated person within the same market area or having the same market conditions. The Commission adds new finding of fact 19 and new conclusion of law 11 to reflect that Entergy met the requirements in PURA § 36.058 regarding payments to its affiliates for its rate-case expenses.

The Commission also makes minor corrections to conclusions of law 6 and 8 to incorporate the statutory reference into the language of the conclusion of law. Consistent with the discussion above, the Commission adopts the following findings of fact and conclusions of law:

---

[8] Proposal for Decision at 33-34.

[9] *Id.* at 25-27.

## IV.    Findings of Fact

1. Entergy Texas, Inc. (ETI or the Company) is an investor-owned electric utility with a retail service area located in southeastern Texas.

2. On November 28, 2011, ETI filed an application (the ETI Application) requesting, among other things, approval of a proposed increase in annual base rate revenues of approximately $111.8 million over adjusted test year revenues, and a new rider for recovery of costs related to purchased power capacity.

3. On November 29, 2011, the Public Utility Commission of Texas (Commission or PUC) referred the ETI Application to the State Office of Administrative Hearings (SOAH) for a hearing and the matter was assigned docket number 39896 (Docket 39896).

4. On April 4, 2012, in Docket 39896, the ALJs issued SOAH Order No. 13 severing rate-case expense issues into a new docket, the case at issue here, Application of Entergy Texas, Inc. for Rate Case Expenses Severed from PUC Docket No. 39896, Docket No. 40295.

5. The hearing on the merits in Docket 39896 was held in April-May 2012.

6. The Proposal for Decision (PFD) in Docket 39896 was issued July 6, 2012.

7. The Commission issued its final order in Docket 39896 on November 2, 2012.

8. The hearing on the merits in the present docket, Docket 40295, was held on November 28, 2012. The record closed on December 21, 2012, following the filing of post-hearing briefs.

9. The following parties were granted intervenor status in this docket: Office of Public Utility Counsel (OPUC); the cities of Anahuac, Beaumont, Bridge City, Cleveland, Conroe, Dayton, Groves, Houston, Huntsville, Montgomery, Navasota, Nederland, Oak Ridge North, Orange, Pine Forest, Rose City, Pinehurst, Port Arthur, Port Neches, Shenandoah, Silsbee, Sour Lake, Splendora, Vidor, and West Orange (Cities); State Agencies; and Texas Industrial Energy Consumers (TIEC). The staff (Staff) of the Commission was also a participant in this docket.

10. In Docket 39896, ETI adjusted its request for a proposed increase in annual base rate revenues to approximately $104.8 million over adjusted Test Year revenues.

11. In the PFD in Docket 39896, the ALJs recommended an overall rate increase of $28.3 million.

12. In its final order in Docket 39896, the Commission largely followed the recommendations contained in the PFD, but reduced ETI's overall rate increase to $27.7 million.

13. In this docket, ETI seeks to recover $8.8 million in rate-case expenses associated with Docket 39896.

14. Of that total, $7.6 million was incurred by ETI and $1.2 million was incurred by Cities.

15. Cities proved that, through August 31, 2012, they reasonably incurred rate-case expenses of $1,125,768.61 in Docket 39896 and this docket.

16. Cities reasonably estimated that their total rate-case expenses in Docket 39896 and this docket after August 31, 2012 will total $75,800.

16A. The Commission finds that Cities' estimated expenses are not recoverable as rate-case expenses in this docket.

17. The amount of rate-case expenses sought by ETI ($8.8 million) is high, both in absolute terms, and in relation to the rate increase ultimately obtained by ETI in Docket 39896 ($27.7 million).

18. Rate-case expenses for ETI in the amount of $6,896,037.73 are reasonable and necessary and should be allowed as a cost or expense by the Company. This amount is calculated by reducing the requested amount by the amounts listed and for the reasons stated below:

    a.     $207,683 in depreciation of office equipment owned by Entergy Services, Inc. (ESI) (an affiliated company of ETI) and used by ESI employees for their work in Docket 39896 is not reasonable and is properly disallowed.

    b.     $281 for meals over $25 was erroneously sought by ETI, is not reasonable, and is properly disallowed.

c.     $10 for clothing purchased by an attorney for ETI is not reasonable and is properly disallowed.

d.     $40 for laundry charges by an attorney for ETI is not reasonable and is properly disallowed.

e.     $480 for a lodging charge unsupported by receipts is not reasonable and is properly disallowed.

f.     $522,244.66 attributable to unreasonable and overly aggressive arguments pursued by ETI in Docket 39896 related to financially-based incentive compensation is properly disallowed.

19.     The price for Entergy's affiliate payments is not higher than the prices charged by the supplying affiliate for the same item or class of items to its other affiliates or divisions or a nonaffiliated person within the same market area or having the same market conditions.

## V. Conclusions of Law

1.     ETI is a "public utility" as that term is defined in the Public Utility Regulatory Act (PURA) § 11.004(1) and an "electric utility" as that term is defined in PURA § 31.002(6).

2.     The Commission exercises regulatory authority over ETI and jurisdiction over the subject matter of this application pursuant to PURA §§ 32.001, 32.101, 33.002, 33.051, and 36.101-111.

3.     SOAH has jurisdiction over matters related to the conduct of the hearing and the preparation of a proposal for decision in this docket, pursuant to PURA § 14.053 and Tex. Gov't Code § 2003.049.

4.     This docket was processed in accordance with the requirements of PURA and the Texas Administrative Procedure Act, Tex. Gov't Code Chapter 2001.

5.     Pursuant to PURA § 33.051, the Commission has jurisdiction over an appeal from a municipality's rate proceeding.

6.     Pursuant to PURA § 33.023, Cities bore the burden to prove that the rate-case expenses they incurred were reasonable.

7. Cities are entitled to reimbursement by ETI for rate-case expenses of $1,125,768.61 incurred in Docket 39896 and this docket through August 31, 2012.

8. Pursuant to PURA § 36.061(b), ETI bore the burden of proving that the rate-case expenses it incurred in Docket No. 39896 were reasonable.

9. ETI proved the reasonableness of its rate-case expenses in the amount of $6,896,037.73, and is entitled to claim that amount as a cost.

10. Consistent with Commission precedent, it is not in the public interest to permit recovery of estimated rate-case expenses.

11. Entergy met the requirements of PURA § 36.058 regarding payments to its affiliate for its rate-case expenses.

## VI. Ordering Paragraphs

In accordance with these findings of fact and conclusions of law, the Commission issues the following orders:

1. The Proposal for Decision prepared by the SOAH ALJs is adopted to the extent consistent with this Order.

2. All other motions, requests for entry of specific findings of fact and conclusions of law, and any other requests for general or specific relief, if not expressly granted, are denied.

3. Cities' and ETI's requests to recover rate-case expenses are granted to the extent consistent with this Order.

SIGNED AT AUSTIN, TEXAS the 21st day of May 2013

## PUBLIC UTILITY COMMISSION OF TEXAS

DONNA L. NELSON, CHAIRMAN

KENNETH W. ANDERSON, JR., COMMISSIONER

q:\cadm\orders\final\40000\40295fo.docx



APPENDIX C



Control Number: 40295



Item Number: 67

Addendum StartPage: 0

# State Office of Administrative Hearings



2013 FEB 19 PH 3: 24

FILING CLERK

**Cathleen Parsley**
**Chief Administrative Law Judge**

**February 19, 2013**

TO:   Stephen Journeay, Director                                    <u>**Courier Pick-up**</u>
      Commission Advising and Docket Management
      William B. Travis State Office Building
      1701 N. Congress, 7th Floor
      Austin, Texas  78701

RE:   SOAH Docket No. 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
      PUC Docket No. 40295

      *Application of Entergy Texas, Inc. for Rate Case Expenses Pertaining to PUC Docket No. 39896*

      Enclosed is the Proposal for Decision (PFD) in the above-referenced case.  By copy of this letter, the parties to this proceeding are being served with the PFD.

      Please place this case on an open meeting agenda for the Commissioners' consideration.  There is no deadline in this case.  Please notify me and the parties of the open meeting date, as well as the deadlines for filing exceptions to the PFD, replies to the exceptions, and requests for oral argument.

                                    Sincerely,

                                    Hunter Burkhalter
                                    Administrative Law Judge

HB/mle
Enclosure
xc:      All Parties of Record

67

2013 FEB 19 PM 3: 24

| | | |
|---|---|---|
| APPLICATION OF ENTERGY TEXAS, INC. FOR RATE CASE EXPENSES PERTAINING TO PUC DOCKET NO. 39896 | §<br>§<br>§<br>§<br>§ | BEFORE THE STATE OFFICE<br><br>OF<br><br>ADMINISTRATIVE HEARINGS |

## TABLE OF CONTENTS

I. BACKGROUND.................................................................................................................. 1

II. JURISDICTION, NOTICE, AND PROCEDURAL HISTORY ........................................ 2

III. PARTIES ........................................................................................................................ 2

IV. DISCUSSION ................................................................................................................. 3

    A.     Overview ................................................................................................................ 3

    B.     Cities' Rate Case Expenses.................................................................................... 4

    C.     ETI's Rate Case Expenses .................................................................................... 8

         1.     Challenges to Specific ETI Rate Case Expenses That are Relatively Quantifiable ............................................................................ 8

             a.     Costs Associated with Gerald Tucker, ETI's Consulting Expert............................................................................ 8
             b.     Costs Associated with "Lessons Learned" .................................. 10
             c.     ESI Depreciation Costs................................................................ 11
             d.     Miscellaneous Internal Rate Case Expenses ............................... 13
             e.     Costs Associated with the Calpine-Carville PPA....................... 13
             f.     Specific Items That State Agencies Contend Cast Doubt on ETI's Overall Scrutiny of Its Expenses ...................................... 15

                 (1)     External Legal Fees......................................................... 16
                 (2)     Meals and Snacks ............................................................ 17
                 (3)     Courier and Taxi Services............................................... 18
                 (4)     Meals Over $25................................................................ 19
                 (5)     Clothing and Laundry Service......................................... 20
                 (6)     Airfare and Lodging ........................................................ 20

2.   Challenges to Specific ETI Rate Case Expenses That are Difficult to
     Quantify ........................................................................................ 21

          a.   Financially-Based Incentive Compensation ............................... 21
          b.   Transmission Equalization (MSS-2) Expenses .......................... 25
          c.   Purchased Power Capacity Rider.............................................. 27

     3.   Proportional Reduction ......................................................... 28

D.   Recovery Method........................................................................... 34

     1.   Rate Case Expense Allocation and the Recovery Mechanism ............... 34
     2.   ETI's Request to Earn a Return on the Unpaid Balance of Rate
          Case Expenses................................................................... 35

V.  CONCLUSION ........................................................................ 36

VI. PROPOSED FINDINGS OF FACT, CONCLUSIONS OF LAW, AND
    ORDERING PARAGRAPHS ................................................................ 36

    A.   Findings of Fact................................................................ 36

    B.   Conclusions of Law ............................................................ 38

    C.   Proposed Ordering Paragraphs............................................... 39

| APPLICATION OF ENTERGY | § | BEFORE THE STATE OFFICE |
|---|---|---|
| TEXAS, INC. FOR RATE CASE | § | |
| EXPENSES PERTAINING TO PUC | § | OF |
| DOCKET NO. 39896 | § | |
| | § | ADMINISTRATIVE HEARINGS |

## PROPOSAL FOR DECISION

### I.   BACKGROUND

Entergy Texas, Inc. (ETI) is an investor-owned electric utility with a retail service area located in southeastern Texas.  ETI serves retail and wholesale electric customers in Texas.  On November 28, 2011, ETI filed an application requesting approval of an increase in annual base rate revenues, a reconciliation of fuel costs, and authority to defer costs for the transition to the Midwest Independent System Operator (the ETI Application).  On November 29, 2011, the Commission referred the ETI Application, PUC Docket No. 39896, to SOAH (Docket 39896).  On April 4, 2012, the Administrative Law Judges (ALJs) presiding over Docket 39896 issued an order severing from Docket 39896 the issues relating to ETI's request to recover its rate case expenses and creating this docket, Docket 40295, for consideration of the rate case expenses.

In this Proposal for Decision (PFD), the ALJ recommends as follows:

- That Cities[1] be allowed to recover from ETI a total of $1,201,569 in rate case expenses (representing $1,125,769 in rate case expenses incurred through August 31, 2012, plus up to $75,800 in rate case expenses as they are incurred after August 31, 2012); and

- That ETI be allowed to recover a total of $7,344,113 in rate case expenses.

---

[1] The Cities are: the Cities of Anahuac, Beaumont, Bridge City, Cleveland, Conroe, Dayton, Groves, Houston, Huntsville, Montgomery, Navasota, Nederland, Oak Ridge North, Orange, Pine Forest, Rose City, Pinehurst, Port Arthur, Port Neches, Shenandoah, Silsbee, Sour Lake, Splendora, Vidor, and West Orange.

## II.   JURISDICTION, NOTICE, AND PROCEDURAL HISTORY

The Public Utility Commission of Texas (Commission or PUC) has jurisdiction over ETI and this rate case expenses hearing pursuant to Texas Utility Code, Public Utility Regulatory Act (PURA) §§ 32.001, 33.002, and 35.004. The State Office of Administrative Hearings (SOAH) has jurisdiction over the contested case hearing, including the preparation of the proposal for decision (PFD) pursuant to PURA § 14.053 and Texas Government Code § 2003.049(b). ETI's notice of its application and notice of the hearing were not contested and, therefore, do not require further discussion here but will be addressed in the proposed findings of fact and conclusions of law.

The hearing on the merits in Docket 39896 was held in April–May, 2012. The PFD was issued on July 6, 2012. A Final Order in Docket 39896 was issued by the Commission on September 14, 2012. In response to motions for rehearing submitted by multiple parties, the Commission issued an Order on Rehearing on November 2, 2012, in Docket 39896.[2]

The hearing on the merits in the present docket, Docket 40295, was held on November 28, 2012. The record remained open for the filing of post-hearing briefs. The record closed on December 21, 2012.

## III.   PARTIES

In addition to ETI, the following entities were granted party status in this case: Texas Industrial Energy Consumers (TIEC); State of Texas agencies and institutions of higher education (State Agencies); Office of Public Utility Counsel (OPUC); Cities; and the staff of the Public Utility Commission (Staff).

---

[2] Multiple second motions for rehearing were denied by the Commission on December 4, 2012.

The following is a list of the parties who participated in the hearing and their counsel:

| PARTIES | REPRESENTATIVES |
|---|---|
| ETI | Steven H. Neinast, Wajiha Rizvi, and George Hoyt |
| Cities | Stephen Mack |
| TIEC | Meghan Griffiths |
| State Agencies | Susan Kelley |
| OPC | Sarah Ferris |
| Staff | Brennan Foley |

## IV.    DISCUSSION

### A.    Overview

In the ETI Application, ETI requested, among other things, approval of an increase in annual revenues of approximately $104.8 million, proposed tariff schedules including new riders to recover costs related to purchased-power capacity and renewable-energy credit requirements, and final reconciliation of its fuel costs. Prior to the hearing, the Commission effectively denied ETI's request for a purchased-power capacity rider by removing it as an issue to be addressed in the hearing on the ETI Application. In their PFD, the ALJs recommended an overall rate increase for ETI of $28.3 million, did not recommend approving the renewable-energy credit rider sought by ETI, and recommended approving ETI's request to reconcile fuel and purchased power costs during the Reconciliation Period.[3] Ultimately, the Commission largely followed the recommendations contained in the PFD, but reduced the overall rate increase to $27.7 million.[4]

In this docket, Michael P. Considine, a Manager in the Regulatory Accounting Department of Entergy Services, Inc. (ESI), ETI's service company affiliate, testified in support of the company's claim for recovery of rate case expenses. He explained that ETI is seeking authority to recover its

---

[3] *Application of Entergy Texas, Inc. for Authority to Change Rates, Reconcile Fuel Costs, and Obtain Deferred Accounting Treatment*, Docket 39896, Proposal for Decision (July 6, 2012).

[4] *Application of Entergy Texas, Inc. for Authority to Change Rates, Reconcile Fuel Costs, and Obtain Deferred Accounting Treatment*, Docket 39896, Order on Rehearing (November 1, 2012).

rate case expenses over a three-year period, while earning a return on the unamortized balance.[5] ETI seeks to recover $8,752,545[6] in rate case expenses associated with Docket 39896 that were incurred and paid as of September 30, 2012.[7] Of that total, $7,635,236 was incurred by ETI and $1,117,309 was incurred by Cities. Of the total amount, ETI classifies $3,908,214 as "external" rate case expenses (*i.e.*, those expenses paid to outside accounting services, outside counsel, and outside consultants), and $4,844,362 as "internal" rate case expenses (*i.e.*, those expenses related to direct expenses, payroll, benefits, and taxes of ETI and Entergy Services, Inc. (ESI), an affiliated company of ETI).[8] Mr. Considine offered the opinion that all of ETI's internal rate case expenses were reasonable and necessary.[9] Another ETI witness, Stephen F. Morris, offered his opinion that all of ETI's external rate case expenses were reasonable and necessary.[10] Mr. Morris is an attorney and certified public accountant who was retained by ETI to review the company's external rate case expenses.[11] ETI also seeks authority to defer until its next rate case all rate case expenses incurred in Docket 39896 after September 30, 2012.[12]

## B.    Cities' Rate Case Expenses

Pursuant to PURA § 33.023, any municipality participating in a ratemaking proceeding may engage attorneys, consultants, and others to assist it, and the electric utility "shall" reimburse the municipality for its "reasonable cost" of participating in the ratemaking proceeding "to the extent the [Commission] determines is reasonable."

---

[5] ETI Ex. 1 (Considine Direct) at 62.

[6] Initially, ETI sought recovery of $8,752,576. In its briefing, however, ETI explains that it is reducing the amount it seeks to $8,752,545 (a reduction of $31) to account for two excessive charges for meals. ETI Init. Br. at 1 n. 1.

[7] ETI Ex. 6 (Considine Supp.) at 1.

[8] ETI Ex. 6 (Considine Supp.) at 3, 5, and attachment MPC-SD-5. The $1,117,309 in expenses incurred by Cities is included as part of ETI's "internal" expenses.

[9] ETI Ex. 6 (Considine Supp.) at 7.

[10] ETI Ex. 8 (Morris Direct) at 18.

[11] ETI Ex. 8 (Morris Direct) at 1-2.

[12] Transcript from Hearing on the Merits (Tr.) at 17.

In this case, Cities seek reimbursement for rate case expenses totaling $1,201,568.61. Cities identify this amount as the "total actual and estimated rate case expenses" incurred by Cities in four forums: (1) ETI's base rate cases before the municipalities; (2) participation in Docket 39896; (3) participation in any appeals of Docket 39896; and (4) participation in the present case, Docket 40295.[13]  Of the $1,201,568.61 total, $1,125,768.61 represents actual expenses incurred by Cities through August 31, 2012, while $75,800 represents Cities' estimated expenses through completion of Dockets 39896 and 40295, and any appeal.[14]  Cities offered the expert testimony of Amalija "Amy" Hodgins, a former ALJ, who opined that these expenses were reasonable and should be reimbursed.[15]

No party challenged the reasonableness of Cities' expenditures through August 31, 2012 (i.e., $1,125,768.61), and the ALJ can find no reason to do so either.

Staff challenges, however, Cities' attempt to recover their estimated expenses after that date (i.e., $75,800).  Cities seek to be reimbursed for these estimated expenses only "if and when they occur," up to the maximum of $75,800.[16]  Ms. Hodgins offered her opinion that the amount of the estimated expenses is reasonable.[17]   In reliance upon Commission precedent from 2005, Ms. Hodgins argued that estimated rate case expenses are reimbursable.  Ms. Hodgins testified as follows:

> Projected rate case expenses can be, and routinely have been, found reasonable and reimbursable by this Commission.  The fact that a municipality's rate case expenses have not all been incurred, as of the date of the determination of the reasonableness of rate case expenses, does not render them unreasonable.  Expenses need only be reasonable and incurred to be recoverable.

---

[13]  Cities Init. Br. at 2.

[14]  Cities Init. Br. at 5.

[15]  See Cities Ex. No. 1 (Hodgins Direct) and Ex. No. 2 (Hodgins Supp.).

[16]  Cities Ex. 2 (Hodgins Supp.) at n. 6.

[17]  Cities Ex. 2 (Hodgins Supp.) at 13-14.

The future activities and corresponding costs, that are the subject of estimation, are necessary to complete a proceeding before the Commission. The Commission in CenterPoint's CTC case found estimated costs to complete a case were recoverable once the estimated expenses were incurred and known and measurable. . . . Accordingly, it is reasonable for the Commission, in this proceeding, to consider and allow the Cities to recover the estimated costs to complete this proceeding, including possible judicial appeals, if and when those expenses are incurred.[18]

Staff argues, based upon Commission precedent, that Cities are not entitled to reimbursement for estimated future rate case expenses.[19] Staff does not challenge the reasonableness of the amount of estimated expenses, nor does any other party. Rather, Staff asserts that the Commission precedent relied upon by Ms. Hodgins has been superseded by more recent precedent. Specifically, in 2010, the Commission decided a case in which it disallowed estimated rate case expenses. In Docket 37772, the Commission disallowed recovery of estimated expenses, holding that "approving *estimated* rate-case expenses is not in the public interest," but allowed the cities involved in that case to seek "recovery of actual rate-case expenses included in the estimates in [the utility's] next rate case."[20] Thus, Staff argues that Cities' attempt to obtain its estimated expenses should be disallowed.

Staff further argues that Cities should not be entitled to recover the expenses associated with the preparation of the portion of Ms. Hodgins' testimony in which she advocates in support of the recovery of Cities' estimated expenses. By Staff's calculation, this reduction amounts to $1,208.42 (representing Cities' actual costs for Ms. Hodgins' testimony related to the recovery of estimated expenses).[21] No other party joins Staff in its opposition to Cities' estimated expenses.

The ALJ recommends that Cities' request with regard to its estimated expenses be granted. Pursuant to Section 33.023 of PURA, Cities are entitled to reimbursement for their expenses

---

[18] Cities Ex. 1 (Hodgins Direct) at 6-7; citing *Application of CenterPoint Energy Houston Electric, LLC for Competition Transition Charge*, Docket No. 30706, Order at 31 and FOFs 72-74 (Jul. 14, 2005)(Docket 30706).

[19] Staff Init. Br. at 6.

[20] *Application of Southwestern Electric Power Company for Rate Case Expenses Pertaining to Docket No. 37364*, Docket 37772, Order at 1-2 (Oct. 21, 2010)(emphasis in original)(Docket 37772).

[21] Staff Init. Br. at 7.

reasonably incurred in this case. As noted above, no party challenged the reasonableness of Cities' estimation that its expenses after August 2012 would total $75,800. The ALJ concludes that the estimate is reasonable.[22] Most importantly, the ALJ notes that Cities are not actually seeking reimbursement of estimated rate case expenses. Rather, Cities asks for: (1) approval now of the reasonableness of its estimated expenses; but (2) reimbursement of those expenses only after they are incurred, and only up to the estimated amount of $75,800. Cities argue that, from a policy standpoint, it is more economical and efficient for Cities to request reimbursement of reasonable estimated rate case expenses to the extent they are incurred in this case, rather than requiring Cities to wait and ask for reimbursement of those expenses when ETI files a new rate case at some point in the future, a contingency which might not occur for many years. The ALJ agrees. The ALJ further believes that it would be unfair if Cities were obligated to wait until ETI files a new rate case in order to recover its estimated expenses from the present case. Any such arrangement would delay, potentially for years, Cities' recovery of its actual expenses in the present rate case, a result which seems contrary to the clear intent expressed in PURA § 33.023 that municipalities are entitled to reimbursement for their reasonable rate cases expenses. Moreover, such an arrangement would obligate Cities to participate in a future ETI rate case that they might otherwise have no interest in becoming a party to.

For these reasons, the ALJ recommends:

(1)     that Cities' rate case expenses be found to be reasonable in the amount of $1,201,568.61 (consisting of $1,125,768.61 in actual expenses incurred by Cities through August 31, 2012, and $75,800 in estimated expenses to be incurred by Cities after August 31, 2012 through completion of Dockets 39896 and 40295, and any appeal);

(2)     that ETI be ordered to reimburse Cities for $1,125,768.61 in actual expenses incurred by Cities through August 31, 2012; and

---

[22] Indeed, the ALJ notes that Cities attached to their Reply Brief an affidavit from Ms. Hodgins attesting to the fact that, from September through November 2012, Cities actually incurred expenses of $43,525.45 (or 57% of the estimated $75,800). Cities Reply Br. at 4-5, and attached affidavit.

(3)      that ETI be ordered to reimburse Cities for actual expenses incurred by Cities after August 31, 2012, through completion of Dockets 39896 and 40295 and any appeal up to a maximum possible amount of $75,800.

## C.      ETI's Rate Case Expenses

Pursuant to PURA Section 36.061(b), the Commission "may" allow a utility to recover its "reasonable costs of participating in a [ratemaking proceeding] not to exceed that amount approved" by the Commission.

ETI seeks recovery of $8,752,545 in rate case expenses associated with Docket 39896 that were incurred and paid as of September 30, 2012. However, that total includes only the $1,125,768.61 in expenses *incurred* by Cities through August 31, 2012, but does not also include the $75,800 in expenses *estimated* for Cities as discussed above. Because the ALJ is recommending that Cities' estimated expenses be approved as outlined above, the ALJ deems ETI's overall request to have been increased by $75,800 to a total amount of $8,828,345.

The parties other than ETI challenged various components of ETI's rate case expenses. Those challenges are discussed as follows.

### 1.      Challenges to Specific ETI Rate Case Expenses That are Relatively Quantifiable

#### a.      Costs Associated with Gerald Tucker, ETI's Consulting Expert

In Docket 39896, ETI retained Gerald Tucker as a consulting expert to assist in the preparation of the utility's case dealing with affiliate transactions. Mr. Tucker is an accountant who has experience regarding affiliate costs in Commission rate cases and who has commonly assisted ETI in its rate cases.[23]

---

[23] ETI Ex. 8 (Morris Direct) at 29-30.

State Agencies contend that Mr. Tucker's fees should be disallowed. No party other than State Agencies challenged Mr. Tucker's expenses. State Agencies complain that Mr. Tucker: (1) did not testify; (2) provided services that were described by ETI in only "the most general terms;" and (3) provided services (such as reviewing witness testimony, reviewing discovery responses, benchmarking, and assisting in preparing witnesses for deposition) that were duplicative of services provided by ETI's legal counsel or other consultants. Accordingly, State Agencies argue that the $116,119 representing Mr. Tucker's fees should be excluded from rate case expenses.[24]

ETI responds by contending that, over the last 20 years or so, the Commission has, at times, disallowed large percentages of utility companies' affiliate expenses, based upon the fact that ALJs and the Commissioners have had difficulty understanding the complex information supplied by utilities concerning affiliate transactions. In light of that history, ETI contends that it reasonably relied upon the expertise and accounting experience of Mr. Tucker to assist it in preparing and presenting information about the company's affiliate transactions in order to assure that it was understandable. According to ETI, Mr. Tucker has been involved in all rate cases of ETI and its predecessor since in 1997. ETI contends that Mr. Tucker's participation in Docket 39896 enabled the company to present clearer and more accurate information about its affiliate transactions. Moreover, ETI disputes that Mr. Tucker's work was duplicative of the work performed by the company's attorneys, pointing out that Mr. Tucker provided expertise from the accounting perspective, rather than from the legal perspective.[25]

The ALJ recommends that Mr. Tucker's fees be included in the rate case expenses. State Agencies are essentially arguing that it was solely the job of ETI's attorneys and its testifying experts to prepare the case regarding affiliate transactions and, therefore, any work performed by Mr. Tucker with regard to affiliate transactions was purely duplicative. The ALJ disagrees. As pointed out by ETI, the notion that multiple people with varied expertise cannot provide valuable input on a complex issue like affiliate transactions is overly simplistic. ETI demonstrated that Mr. Tucker

---

[24] State Agencies Init. Br. at 18-19.

[25] ETI Init. Br. at 10-11; ETI Ex. 7 (Considine Supp.) at 9-10.

provided real expertise that benefited the company in the presentation of its case. In other words, ETI proved the reasonableness of Mr. Tucker's expenses.

### b.        Costs Associated with "Lessons Learned"

In Docket 39896, ETI included several charges from its law firm, Duggins, Wren, Mann & Romero (Duggins Wren), for "lessons learned," as shown in a July 26, 2011 invoice from the law firm. The charges total $5,743.50.[26] According to ETI, the charges relate to a memo provided to ETI by the firm which contained a "detailed analysis of developments in ETI's last rate case as well as developments in four recent pertinent cases at the PUCT that had taken place since the last ETI rate case."[27] The memo identified procedural and substantive issues for ETI to consider while preparing its rate case in Docket 39896.[28]

State Agencies contend that any "lessons learned" should have already been learned in the prior rate case and, therefore, any "refreshing [of] the learning curve . . . should be a shareholder, not ratepayer, expense. Bringing one's attorneys 'up to speed' for the third rate case filed in five years ought to be regarded as the legal equivalent of a 'luxury item.'"[29] No party other than State Agencies challenged the "lessons learned" expenses.

ETI responds by contending that State Agencies are essentially seeking to punish the company for its efforts to learn from the past. ETI also contends that State Agencies' argument would have the perverse effect of increasing, rather than decreasing rate case expenses. According to ETI:

---

[26]  ETI Ex. 8 (Morris Direct) at 29-30.

[27]  ETI Ex. 12 (Morris Rebuttal) at 28-29 (Attachment SFM-R-3).

[28]  ETI Ex. 12 (Morris Rebuttal) at 28-29 (Attachment SFM-R-3).

[29]  State Agencies Init. Br. at 19.

Incurring these costs to analyze lessons learned from litigating prior rate cases and important aspects of non-ETI Commission rate cases, if anything, reduces overall rate case expenses by supporting a more efficient case presentation and avoiding prior issues that lead to contention among the parties.[30]

The ALJ agrees and recommends that the "lessons learned" expenses be included in the rate case expenses. ETI demonstrated that the expenses were reasonable because they benefited the company in the presentation of its case.

### c.      ESI Depreciation Costs

ETI identified, as part of its "internal" rate case expenses, $207,683 in "Depreciation & Amort" expenses.[31] As explained by ETI witness Considine, the expenses are for the depreciation of assets (apparently office equipment) used by ESI employees who participated in the rate case.[32] Mr. Considine further testified that the costs were a reasonable and necessary part of ESI providing services for the rate case.[33]

State Agencies contend that recovery of such depreciation expenses should be denied because: (1) such a recovery is unprecedented; (2) ETI has failed to prove that the expenses were reasonable and necessary; and (3) the expenses were not "incurred" for the rate case. As to the last point, State Agencies explains: "ESI's depreciable property exists, and is presumably depreciated, whether or not proceedings in Texas take place. As such, this 'cost' was not necessary for ETI's participation in the rate case and should be disallowed."[34] No party other than State Agencies challenged the depreciation expenses.

---

[30] ETI Init. Br. at 13.

[31] ETI Ex. 7 (Considine Rebuttal) at 9-11 and Attachment MPC-R-1.

[32] ETI Ex. 7 (Considine Rebuttal) at 11.

[33] ETI Ex. 7 (Considine Rebuttal) at 11.

[34] State Agencies Init. Br. at 20.

ETI responds by explaining that the costs at issue are "a loader to ESI labor costs covering depreciation on office expenses and capital." Notably, however, ETI also concedes that such costs would "typically [be] embedded in a vendor's labor costs billed to the Company."[35]

The ALJ recommends that the depreciation expenses be disallowed. ETI has not cited to any precedent which would justify the recovery of these apparently unusual rate case expenses. Moreover, ETI has failed to prove the reasonableness of the expenses under the more stringent standards that are applicable to affiliate expenses. As explained in *Railroad Comm'n v. Rio Grande Valley Gas Company*, unlike arms-length transactions, affiliate transactions "are clearly tainted with the possibility of self-dealing."[36] The Commission and the courts have consistently placed a greater burden of proof upon a utility company to prove the reasonableness of transactions with its affiliated companies because of the potential for self-dealing.

In this case, ETI is seeking reimbursement of $2.9 million for payments it made to its affiliate, ESI, for work done by ESI employees relevant to Docket 39896, *plus* $207,683 for depreciation of the assets used by the ESI employees in their work.[37] This is in stark contrast to its arms-length dealings with outside consultants. For example, ETI is seeking reimbursement for $2.4 million in expenses from Duggins Wren, but it is not also seeking to recover depreciation expenses for Duggins Wren's equipment. If the work done by ESI employees had, instead, been done by outside consultants, it is very doubtful that the outside consultants would also have expected an ETI payment for the depreciation of their equipment. Thus, the very nature of ETI's depreciation request calls its validity into question. Simply put, ETI has failed to establish that it is entitled to recover a depreciation expense related to an affiliate transaction because it would not similarly recover such an expense in an arms-length transaction with an unaffiliated company.

---

[35] ETI Init. Br. at 12.

[36] 683 S.W.2d 783, 786 (Tex. App.—Austin 1985, no pet.).

[37] ETI Ex. 7 (Considine Rebuttal) at Attachment MPC-R-1.

### d.      Miscellaneous Internal Rate Case Expenses

Under the heading of "Internal Rate Case Expenses (Non-Payroll)," ETI seeks recovery of a number of categories of expenses. State Agencies challenge the following four categories:

- "business meals/entertainment" in the amount of $3,852;

- "other employee expenses" in the amount of $3,423;

- "employee mtgs/functions" in the amount of $7,762; and

- "utility bills" in the amount of $2,518.[38]

According to State Agencies, the justification for these charges has not been explained, nor are they reasonable and necessary. No other party challenged these expenses.

ETI responds by explaining, in great detail, where the supporting documentation can be found, within the company's exhibits, to justify each of the expenses.[39] Without repeating that discussion here, the ALJ is convinced that the evidence in the record supports the conclusion that the expenses are reasonable and should be recovered by ETI.

### e.      Costs Associated with the Calpine-Carville PPA

In a "Recommendation" filed prior to the hearing in this matter, OPUC argued that the Commission should disallow the recovery of any rate case expenses associated with the regulatory approval of the Calpine-Carville Purchased Power Agreement (the Calpine-Carville PPA). In Docket 39896, ETI sought, and obtained, regulatory approval of the Calpine-Carville PPA. The affiliate expenses related to the contract were assigned to Project F3PPWET308. The Project F3PPWET308 costs were approved for recovery in Docket 39896.[40] As a result, OPUC

---

[38] ETI Ex. 7 (Considine Rebuttal) at Attachment MPC-R-1; *see also* State Agencies Init. Br. at 21.

[39] ETI Reply Br. at 23-24.

[40] *Application of Entergy Texas, Inc. for Authority to Change Rates, Reconcile Fuel Costs, and Obtain Deferred Accounting Treatment*, Docket 39896, Proposal for Decision at 236 (July 6, 2012).

contends that ETI has already recovered its expenses associated with the Calpine-Carville PPA and, if it were allowed to recovery those expenses again, it would be receiving a double recovery.[41] OPUC did not identify a specific dollar amount that it believes should be disallowed. Moreover, OPUC did not discuss this issue in any of its post-hearing briefing. In their post-hearing briefing, State Agencies "concurred" with OPUC's recommendation, but provided no discussion of the issue.[42]

ETI did discuss this issue in its post-hearing briefing. The company points out, correctly, that the Commission has already specifically rejected OPUC's double recovery argument. In Docket 39896, OPUC argued that the costs ETI sought related to the Calpine-Carville PPA should have been denied in that docket because they were, among other things, rate case expenses. The Commission specifically disagreed and allowed recovery of the costs in that docket.[43] In other words, because the Commission has already concluded that ETI did not recover any rate case expenses associated with the Calpine-Carville PPA in Docket 39896, the company will not be receiving a double recovery if it recovers such expenses in this docket.

Further, as explained by ETI witness Considine, costs were charged to Project F3PPWET308 (the internal project code for the Calpine-Carville PPA development costs) as the contract was being developed. Those costs were recovered in Docket 39896. On the other hand, costs were charged to Project F5PPETX011 (the internal project code for the rate case in Docket 39896) as testimony or other hearing-related work was performed for Docket 39896. According to ETI, it is only the latter costs, associated with Project F5PPETX011, that are being sought here. As a result, no double recovery will occur.[44] The ALJ concludes that ETI has the better argument on this issue, and

---

[41] *Application of Entergy Texas, Inc. for Rate Case Expenses Pertaining to PUC Docket No. 39896,* Docket 40295, OPUC's Recommendation and Request for Hearing at 2-3 (November 6, 2012).

[42] State Agencies Reply Br. at 20.

[43] *Application of Entergy Texas, Inc. for Authority to Change Rates, Reconcile Fuel Costs, and Obtain Deferred Accounting Treatment,* Docket 39896, Proposal for Decision at 236 (July 6, 2012).

[44] ETI Ex. 7 (Considine Rebuttal) at 7-9.

recommends that ETI be allowed to recover its rate case expenses associated with the Calpine-Carville PPA.

### f.　Specific Items That State Agencies Contend Cast Doubt on ETI's Overall Scrutiny of Its Expenses

State Agencies performed what they described as a number of "spot check" reviews of ETI's costs and identified several errors or items that they contend should be disallowed. Moreover, State Agencies contend that it is not only these specific items which should be disallowed. Rather, they argue that the flaws they have identified should cast doubt on the overall adequacy of the internal review process utilized by ETI in quantifying its rate case expenses. According to State Agencies, "[i]dentification of these questionable costs underscores the need for conservative, rather than liberal, standards for allowing rate case expenses."[45] Similarly, State Agencies argue that these items demonstrate ETI's "lack of diligence in exercising basic economic restraint."[46]

Staff agrees that State Agencies' examination of these issues "call[s] into question the thoroughness of ETI's review of its rate case expenses."[47] Staff further points out that, because the testimony of ETI witness Considine (who was the company's prime witness supporting the reasonableness of its internal rate case expenses) contained "mistakes that he was engaged to identify," his testimony "is of limited value."[48] In its Reply Brief, Staff reiterates: "Staff shares the concerns raised by State Agencies regarding the adequacy of ETI's review of its rate case expenses."[49] Similarly, OPUC agrees that State Agencies' examples illustrate that, as to rate case expenses, ETI did not act as a prudent gatekeeper.[50]

---

[45] State Agencies Init. Br. at 7.

[46] State Agencies Reply Br. at 9.

[47] Staff Init. Br. at 12.

[48] Staff Init. Br. at 12.

[49] Staff Reply Br. at 9.

[50] OPUC Init. Br. at 1.

### (1)    External Legal Fees

ETI seeks to recover roughly $2.4 million in legal fees paid to the Duggins Wren law firm.[51] State Agencies argue that this amount should be reduced. ETI witness Stephen Morris was hired to review ETI's external legal expenses and testify about the reasonableness of those expenses.[52] State Agencies question the objectivity, quality, and extent of Mr. Morris' review. For example, State Agencies point out that, rather than being retained by ETI, he was retained by Duggins Wren, the firm whose fees he was to review.[53] Staff agrees that this arrangement "likely undermined Mr. Morris' objectivity."[54]

State Agencies also contend that, based upon his invoices, Mr. Morris spent only a "minimal" amount of time reviewing Duggins Wren's bills.[55] Yet, by State Agencies' own reckoning, Mr. Morris and his associate spent roughly 21 hours reviewing Duggins Wren bills.[56] Mr. Morris testified as to the reasonableness of the hourly rates charged by Duggins Wren. State Agencies argue, however, that Mr. Morris' focus was too narrow and he should have, instead, been critical of the fact that too many Duggins Wren attorneys, twelve, were involved in the case.[57] State Agencies are also critical of the fact that Mr. Morris apparently did not scrutinize Duggins Wren's bills for duplicative legal work. For example, State Agencies point out that on April 25, 2012, a day from the hearing in Docket 39896, five Duggins Wren attorneys billed a total of 26.3 hours for a hearing day that lasted less than seven hours and in which in-house ETI lawyers defended many of the witnesses. On the next day, April 26, six Duggins Wren attorneys billed a total of 24.4 hours for a hearing day that lasted less than eight hours and in which only three Duggins Wren attorneys participated.[58] State

---

[51]  ETI Ex. 7 (Considine Rebuttal) at Attachment MPC-R-1.

[52]  ETI Ex. 8 (Morris Direct) at 2.

[53]  State Agencies Init. Br. at 10.

[54]  Staff Reply Br. at 9.

[55]  State Agencies Init. Br. at 10.

[56]  State Agencies Init. Br. at 12.

[57]  State Agencies Init. Br. at 9.

[58]  State Agencies Init. Br. at 13.

Agencies contend that "a reduction is in order" for the Duggins Wren costs, but do not suggest what size the reduction should be.

ETI responds by defending the reasonableness of the Duggins Wren costs. For one thing, ETI points out that the $2.4 million in legal fees paid to Duggins Wren includes fees and expenses for five consultants billed through Duggins Wren without mark-up.[59] Additionally, ETI explains that the huge scope of the hearing necessitated substantial legal work. ETI presented 39 witnesses who discussed hundreds of categories of costs. ETI points out that while it used the services of 12 attorneys, they were opposed by 15 attorneys: four for Staff; three for TIEC; three for Cities; and one each for State Agencies, OPUC, U.S. Department of Energy, Kroger, and Wal-Mart.[60]

The ALJ is unswayed by State Agencies' arguments. Given the size and complexity of Docket 39896, the legal costs involved do not appear to be inordinate. Mr. Morris testified, credibly, that the fees and expenses charged by Duggins Wren were reasonable and necessary. The ALJ does not recommend any reduction of the fees in response to State Agencies' arguments.

### (2)     Meals and Snacks

State Agencies identified 19 entries in Duggins Wren invoices whereby the firm charged ETI for meals or snacks. According to State Agencies, most of these purchases occurred during business hours and involved only law firm personnel. ETI personnel were only occasionally involved in these purchases. Almost all of the charges were for meals or snacks delivered to Duggins Wren's offices. The purchases total $2,723.54.[61] State Agencies contend that these costs were not necessary for participation in Docket 39896 and should be disallowed.

---

[59] ETI Reply Br. at 19; ETI Ex. 6 (Considine Supp.) at 8.

[60] ETI Reply Br. at 19.

[61] State Agencies Init. Br. at 14-15.

Moreover, State Agencies point out that Duggins Wren is applying a different standard to itself than it applies to its own contractors. Pursuant to the contract by which Duggins Wren hired Mr. Morris, meals while he or his staff are located at his office are not reimbursable.[62] Thus, State Agencies conclude that Duggins Wren should be held to the same standard when passing on rate case expenses for office meals, beverages, and snacks.[63]

ETI responds by pointing out that the charges were not done routinely, but only when necessary to enable personnel "to work over lunch and dinner to meet certain deadlines . . . and as an alternative to purchasing reimbursable meals at restaurants when out-of-town members of the rate case team worked in Austin."[64] ETI describes the expenses as a reasonable part of prosecuting a laborious rate case. The ALJ agrees and does not recommend any disallowance of these costs.

### (3)     Courier and Taxi Services

State Agencies identified 20 dates in Duggins Wren invoices whereby the firm charged ETI for courier, taxi, or Federal Express charges for delivery of documents that State Agencies argue could have been delivered electronically. The charges total $1,004.52.[65] State Agencies contend that these costs were not necessary for participation in Docket 39896 and should be disallowed. State Agencies again point out that Duggins Wren is applying a different standard to itself than it applies to its own contractors. The contract by which Duggins Wren hired Mr. Morris states that "advances in technology, specifically transmission of information and documentation by e-mail, scanning, . . . etc. have made routine . . . delivery of hard copy documents less critical and, in many

---

[62]  State Agencies Ex. 15 at. 3.

[63]  State Agencies Init. Br. at 14.

[64]  ETI Reply Br. at 20.

[65]  State Agencies Init. Br. at 16-17.

cases, unnecessary."[66] Thus, State Agencies conclude that Duggins Wren should be held to the same standard when passing on rate case expenses for document delivery.[67]

ETI responds by explaining the context of many of the charges. For example, two of the three cab fares were for a paralegal to attend and transport voluminous documents to the hearing, and the third was to transport the same paralegal to the Commission for legal research.[68] As to the courier and FedEx charges, ETI points out that Commission rules *require* some types of documents to be physically delivered for filing, and that the use of couriers and FedEx is sometimes entirely appropriate. ETI argues that it was "completely reasonable" for ETI to have incurred roughly $1,000 in courier and FedEx charges over the course of a rate case of the size and scope of Docket 39896. The ALJ agrees and recommends no disallowance of these charges.

### (4)    Meals Over $25

ETI asserts that its intent was to exclude from its rate case expenses any meals above $25 per person.[69] State Agencies have, however, identified at least six meals above $25 that were erroneously included as a part of ETI's rate case expenses.[70] ETI admits that at least some of these charges were included in error.[71] ETI disputes, however, the notion that these errors should call into question the overall reliability of its rate case expenses.

The ALJ agrees with ETI. This was a large case with a large number of expenses. The relatively few errors with respect to meals uncovered by State Agencies do not lead the ALJ to doubt the overall accuracy of ETI's accounting. Nevertheless, by the ALJ's reckoning, the total amount

---

[66] State Agencies Ex. 15 at 4.

[67] State Agencies Init. Br. at 16.

[68] ETI Reply Br. at 20.

[69] State Agencies Ex. 5.

[70] State Agencies Exs. 1, 12; State Agencies Reply Br. at Atts. 3, 6.

[71] Tr. at 40.

that should be disallowed for meals over $25 (*i.e.*, the amount by which the meals exceeded $25/meal) is $281.04.

### (5)    Clothing and Laundry Service

State Agencies identified, as part of ETI's requested rate case expenses, a $10.44 invoice from a Duggins Wren attorney for the purchase of a shirt and socks "due to unexpected extended stay."[72] Similarly, OPUC contests a $40.33 laundry charge incurred by the same attorney for the same reason.[73] ETI witness Considine generally agreed that clothing charges by attorneys working on the rate case should not be passed through to ratepayers as a rate case expense.[74]

ETI argues that the expenses were reasonable because they were brought about by an unplanned, but necessary, extension of the attorney's business trip.[75] Mr. Morris testified that such expenses can be considered reasonable.[76] Nevertheless, ETI has agreed to no longer request reimbursement for the $10.44 clothing charge. Because laundry has to be done regardless of where one finds oneself, the ALJ recommends that the $40.33 laundry charge likewise be disallowed.

### (6)    Airfare and Lodging

State Agencies identify several charges for airfare by ETI employees or consultants that were in the $500 to $650 range. State Agencies fault ETI for not controlling costs by securing discount, or at least more economical, fares.[77] Similarly, State Agencies complain that, too often, ETI employees or consultants "went 'first class' on accommodations," incurring charges of more than $200 per night

---

[72] State Agencies Ex. 17 at 20.

[73] OPUC Init. Br. at 1-2.

[74] Tr. at 43.

[75] ETI Reply Br. at 22.

[76] Tr. at 67-68.

[77] State Agencies Reply Br. at 11-12.

and, on occasion, $300 per night. State Agencies also complain of inadequate documentation of lodging charges, pointing to a $479.55 lodging charge without any underlying receipts.[78] ETI makes no response to these complaints.

The ALJ acknowledges that these complaints raise a legitimate concern. It is human nature to be more carefree with "other people's money" than with one's own. The complaints raised by State Agencies suggest that ETI may have been more lax with its spending because it believed that airfare and lodging expenses would ultimately be borne by its ratepayers. Nevertheless, other than for the $479.55 lodging charge, State Agencies' complaints are too vague and unproven to justify any specific disallowance recommendations by the ALJ. For example, although it might not always cost $600 to get from Point A to Point B, such a fare might be unavoidable under certain circumstances. Without evidence in the record demonstrating that ETI paid $600 for an airfare when a cheaper fare was available, the ALJ cannot conclude that the fare was unreasonable. The same logic applies to the lodging complaints. Accordingly, the ALJ recommends no large disallowances related to airfare and lodging charges, but does recommend disallowing the $479.55 lodging charge that is unsupported by receipts.

## 2.    Challenges to Specific ETI Rate Case Expenses That are Difficult to Quantify

### a.    Financially-Based Incentive Compensation

One of the hotly contested issues in Docket 39896 concerned ETI's request to recover, through its rates, incentive compensation paid to its employees that was tied to the company's financial goals (financially-based incentive compensation). In Docket 39896, all parties, including ETI, agreed that Commission precedent mandated that financially-based incentive compensation is not recoverable. Nevertheless, in its application, ETI asked the Commission to reconsider its precedents on this issue. ETI contended that the reason why cost recovery had been denied for financially-based incentive compensation in prior rates cases was that, in those prior cases, there was

---

[78] State Agencies Reply Br. at 13-14.

a lack of evidence showing sufficient benefits to ratepayers. ETI asserted that it assembled evidence not previously considered by the Commission showing the benefits to ratepayers of using financial measures in incentive compensation programs.

All of the other parties in Docket 39896 opposed ETI's efforts to recover the costs of its financially-based incentive compensation, uniformly agreeing that the Commission has a well-established and straightforward policy that incentive compensation tied to financial goals is not recoverable. In the PFD in Docket 39896, the ALJs concluded that ETI should not be entitled to recover its financially-based incentive compensation costs:

> Simply put, the ALJs conclude that ETI has failed to establish a sufficient justification for overturning the well-established Commission policy that financially based incentive compensation is not recoverable.[79]

The Commission agreed and ordered that $6,196,037 plus associated FICA taxes (representing ETI's financially-based incentive compensation payments) should be removed from ETI's Operating and Maintenance (O&M) expenses, and $335,752.96 (representing ETI's capitalized incentive compensation that was financially-based) should be excluded from ETI's rate base.[80]

In this docket, Staff, State Agencies, and OPUC contend that ETI should not be entitled to recover any rate case expenses it incurred in attempting to recover its financially-based incentive costs in Docket 39896. For example, Staff argues that, by challenging "overwhelming Commission precedent," ETI did not act reasonably when it incurred expenses litigating for recovery of its financially-based incentive costs.[81] Staff contends that the Commission has such an "unequivocal" history of denying recovery for financially-based incentive payments that "ETI should have known

---

[79] *Application of Entergy Texas, Inc. for Authority to Change Rates, Reconcile Fuel Costs, and Obtain Deferred Accounting Treatment*, Docket 39896, Proposal for Decision at 236 (July 6, 2012).

[80] *Application of Entergy Texas, Inc. for Authority to Change Rates, Reconcile Fuel Costs, and Obtain Deferred Accounting Treatment*, Docket 39896, Order on Rehearing at 17-18, 24-25 (November 1, 2012)

[81] Staff Reply Br. at 5; *see also* Staff Init. Br. at 7-10.

that litigating a position opposed to [it] was not a reasonable use of resources."[82]  State Agencies point out that Docket 39896 was merely the latest of three recent cases in which ETI sought, but failed to obtain, authority to charge ratepayers for its financially-based incentive costs (the others being Dockets 34800 and 37744).[83]

ETI defends its decision to seek to recover financially-based incentive costs in Docket 39896 by contending that the issue of the compensability of such costs is undergoing "continuing clarification" at the Commission.[84]  Moreover, ETI suggests that, in open meetings, "Commissioners" have expressed some concern with the Commission's precedents on this issue and suggested recovery might be allowed in a "properly organized and evidenced" case.[85]  Finally, ETI points to a recent SOAH order in an on-going SWEPCO rate case in which the ALJs denied State Agencies' attempt to have stricken testimony proffered by SWEPCO regarding financially-based incentive compensation.[86]

The ALJ agrees with Staff, State Agencies, and OPUC.  It was obvious throughout the hearing in Docket 39896 that ETI was taking an aggressive position and making a "long-shot" argument in seeking recovery for its financially-based incentive compensation.[87]  In its briefing in the present case, ETI cites to a number of cases in which, over the years, other utilities have requested recovery of financially-based incentive compensation.  These examples, however, hurt ETI's cause more than they help it because all of the requests were unanimously denied by the Commission.  This hardly suggests that the issue is undergoing "continuing clarification."  Likewise, ETI's suggestion that "Commissioners" have expressed some concern with the Commission precedent overstates and distorts the facts.  The statements relied upon by ETI came from a single Commissioner,

---

[82]  Staff Init. Br. at 8.

[83]  State Agencies Init. Br. at 7-8.

[84]  ETI Init. Br. at 7.

[85]  ETI Init. Br. at 7; ETI Ex. 12 (Morris Rebuttal) at 5-6.

[86]  *Application of Southwestern Electric Power Company for Authority to Change Rates and Reconcile Fuel Costs*, Docket No. 40443, SOAH Order No. 17 (Dec. 13, 2012).

[87]  The ALJ in the present case was also one of the presiding ALJs in Docket 39896.

Mr. Anderson, not multiple Commissioners. Moreover, in that statement, Commissioner Anderson only obliquely implied that he might prefer to allow recovery for financially-based incentive costs, but he agreed that Commission precedent mandates otherwise, and the Commission voted unanimously to disallow such costs in the case before them. Additionally, Commissioner Anderson has stated that, if the Commission were to ever discontinue "such a long and accepted precedent," it should do so through "rulemaking" rather than "do it in a particular case."[88]

Finally, ETI's reliance on the recent SOAH order in the SWEPCO case is similarly misplaced. In that order, the ALJs effectively held that SWEPCO was not *legally precluded* from seeking recovery for its financially-based incentive compensation. It is one thing to acknowledge that a utility has a legal right to pursue a long-shot theory. It is another thing entirely, however, to hold that the ratepayers must pay the costs of the utility's pursuit of that long-shot.

Simply put, the ALJ concludes that ETI did not act reasonably when it incurred expenses litigating for recovery of its financially-based incentive costs in the face of clear and consistent precedent to the contrary on the issue. As such, the ALJ recommends that ETI's expenses be cut by some amount to account for this issue. The problem then becomes how to quantify the size of the disallowance. A few of ETI's expenses relating to the pursuit of its financially-based incentive compensation are clear. ETI utilized the services of Dr. Jay Hartzell as an expert witness on this issue. In total, ETI paid Dr. Hartzell at least $12,825 in consulting fees, plus $13,680 in legal fees related to the preparation of his testimony.[89] This, however, does not capture ETI's entire cost of litigating the issue of financially-based incentive compensation. Substantial costs were incurred, for example, in discussing the issue at the hearing and in post-hearing briefing. These additional amounts are not in the record. In Section IV.C.3 of this PFD, below, the ALJ discusses various possible approaches for reducing the amount of rate case expenses recovered by ETI to account for the financially-based incentive compensation issue.

---

[88] Staff Reply Br. at 6; OPUC Ex. 3; Open Meeting Tr. at 190 (July 30, 2009).

[89] ETI Ex. 10 (Morris Supp. Direct) at 15-16; State Agencies Ex. 3.

### b.    Transmission Equalization (MSS-2) Expenses

Another of the hotly contested issues in Docket 39896 concerned ETI's request to recover, through its rates, roughly $9 million more for transmission equalization payments than it actually paid in the Test Year. ETI is one of several "Entergy Operating Companies" that shares usage of an Entergy transmission grid. Payments for use of the grid (the transmission equalization payments) are made among the Entergy Operating Companies based upon a highly complex formula set out in the "MSS-2" agreement.

In the Test Year at issue in Docket 39896, ETI made transmission equalization payments totaling roughly $1.7 million. Rather than seeking to recover only $1.7 million, however, ETI sought to recover roughly $10.7 million, which it claimed represented its anticipated transmission equalization payments in the Rate Year. ETI claimed the additional $9 million was based on the company's estimates of transmission construction projects that were expected to have been completed by or during the Rate Year.

All other parties in Docket 39896 opposed ETI's effort to recover more than its Test Year expenses. The ALJs concluded that ETI failed to meet its burden to prove that its proposed Rate Year MSS-2 costs were known and measurable.[90] The Commission agreed and ordered that only ETI's Test Year costs should be counted.[91] The Commission described ETI's projection of its Rate Year expenses as "uncertain and speculative."[92]

In this docket, Staff, OPUC, and State Agencies contend that ETI should not be entitled to recover any rate case expenses it incurred in attempting to recover the additional $9 million in

---

[90] *Application of Entergy Texas, Inc. for Authority to Change Rates, Reconcile Fuel Costs, and Obtain Deferred Accounting Treatment*, Docket 39896, Proposal for Decision at 116 (July 6, 2012).

[91] *Application of Entergy Texas, Inc. for Authority to Change Rates, Reconcile Fuel Costs, and Obtain Deferred Accounting Treatment*, Docket 39896, Order on Rehearing at 20-21, FOFs 87-94 (November 1, 2012).

[92] *Application of Entergy Texas, Inc. for Authority to Change Rates, Reconcile Fuel Costs, and Obtain Deferred Accounting Treatment*, Docket 39896, Order on Rehearing at 20, FOF 90 (November 1, 2012).

projected transmission equalization payments.[93] As explained by Staff: "It was clearly unreasonable for ETI to have sought recovery for [its projected Rate Year costs] due to the exceedingly speculative nature of those costs, and therefore a disallowance to its requested rate case expense amount should be imposed."[94] OPUC witness Nathan Benedict testified that, by seeking the additional $9 million, ETI was, in effect, challenging the precedent that post-Test Year adjustments must be known and measurable.[95]

ETI responds by first disputing the notion that it was "challenging precedent" by seeking the additional $9 million.

> ETI did not incur rate case expenses in pursuit of a position contrary to the well-established 'known and measurable' standard for PTYAs [post Test Year adjustments]. Rather, the Commission disagreed that the evidence put forth by ETI *met* that standard. This is a very important distinction. Finding that evidence put forth by a utility did not meet an established standard does not equate to a finding that the utility unreasonably contested the *applicability* of such standard.[96]

ETI further points out that the evidence in the record supported its contention that its actual post-Test Year transmission equalization payments were on an upward trend.[97]

The ALJ recommends that ETI's rate case expenses associated with its pursuit of the additional $9 million for post-Test Year transmission equalization payments be disallowed. The ALJ acknowledges the distinction made by ETI: It sought not to challenge the "known and measurable" precedent, but merely failed to meet the standard. In this regard, ETI's position as to transmission equalization payments was perhaps less controversial than its position as to financially-based incentive compensation. Nevertheless, ETI took another "long-shot" position as to its transmission equalization payments. Its claim was based on future transmission construction projects that might

---

[93] OPUC Init. Br. at 9-10, 12; Staff Init. Br. at 13; State Agencies Reply Br. at 17.

[94] Staff Init. Br. at 13.

[95] OPUC Ex. 1 (Benedict Direct) at 7-8.

[96] ETI Init. Br. at 8 (emphasis in original, footnotes omitted).

[97] ETI Reply Br. at 16.

never be undertaken and that were found by the Commission to have been speculative. Accordingly, the ALJ concludes that ETI did not act reasonably when it litigated the issue, and recommends that ETI's expenses related to this issue not be passed on to the ratepayers.

Having concluded that these rate case expenses should not be paid by the ratepayers, the problem again becomes how to quantify the expenses. ETI did not structure its rate case expenses in such a manner as to make it possible to determine how much of the expenses were incurred in pursuing the additional $9 million in transmission equalization payments.[98] In Section IV.C.3 of this PFD, below, the ALJ discusses various possible approaches for reducing the amount of rate case expenses recovered by ETI to account for the transmission equalization payments issue.

### c.     Purchased Power Capacity Rider

In Docket 39896, ETI initially requested a Purchased Power Capacity Rider (PPCR), instead of including purchased capacity costs in base rates. The Commission, however, rejected the PPCR request in a Supplemental Preliminary Order on the grounds that the Commission already had a then-pending rulemaking effort underway to determine the structure of such a rider for all generating utilities.[99]

In this docket, Staff, OPUC, and State Agencies argue that ETI should not be entitled to recover any rate case expenses it incurred in attempting to secure a PPCR because it was too speculative in light of the pending rulemaking effort.[100]

ETI responds by contending that the mere fact that there was a rulemaking effort underway with respect to PPCRs did not mean that ETI was somehow precluded from seeking a PPCR through its application.   Moreover, ETI notes that, in briefing during Docket 39896, Staff, State Agencies,

---

[98]  Tr. at 45-46.

[99] *Application of Entergy Texas, Inc. for Authority to Change Rates, Reconcile Fuel Costs, and Obtain Deferred Accounting Treatment*, Docket 39896, Supplemental Preliminary Order at 2 (Jan. 9, 2012).

[100]  OPUC Init. Br. at 10; Staff Init. Br. at 14 and Reply Br. at 8-9; State Agencies Reply Br. at 17.

and TIEC all took the position that there was no legal impediment to ETI's seeking a PPCR in the rate case.[101]

The ALJ agrees with ETI and does not recommend any disallowances in relation to the PPCR request. The fact that there was a pending proposed rule at the time ETI asked for the rider should not be viewed as precluding ETI's request. Indeed, the very uncertainty inherent in the rulemaking process suggested that the accepted practices with regard to purchased capacity costs were in a state of flux and, therefore, it was reasonable for ETI to pursue the rider.

## 3.      Proportional Reduction

In addition to the above challenges to specific items of expense incurred by ETI, a number of parties raised more generic concerns about the company's rate case expenses. State Agencies expressed concern that, as a general matter, rate case expenses in cases before the Commission appear to be "getting out of hand." [102] Staff "firmly agrees" with this concern.[103] State Agencies worry that utilities have no incentive to minimize the number of rate case proceedings or the efficiency of rate case presentation because they assume their costs will simply be passed on to ratepayers.[104] State Agencies urge the Commission to allocate rate case expenses in such a way that incentivizes utilities to more productively and efficiently use their time in rate cases.[105] OPUC agrees that the standard for evaluating the amount of rate cases expenses to be reimbursed ought to be structured so as to give a utility pause before deciding to pursue overly aggressive or novel arguments.[106]

---

[101] ETI Reply Br. at 16-17.

[102] State Agencies Init. Br. at 1-2.

[103] Staff Reply Br. at 13.

[104] State Agencies Init. Br. at 1-2.

[105] State Agencies Init. Br. at 5.

[106] OPUC Init. Br. at 8.

Along these same lines, Staff and OPUC expressed concern about the frequency of ETI rate cases over recent years. Docket 39896 was the third ETI rate case in four years. Each case resulted in a rate increase and an obligation for the ratepayers to pay ETI's rate case expenses.[107] Staff and OPUC also expressed concern about the overall size of the rate case expenses in relation to the outcome of the underlying rate case. Total rate case expenses ($8.8 million) equal roughly one-third of the total approved rate increase ($27.7 million).[108] Staff, State Agencies, and OPUC all expressed the concern that ETI did not provide good stewardship in incurring rate case expenses.[109]

In order to address these concerns, the parties have suggested a number of methodologies for reducing the rate case expenses.

- **The 50/50 approach.** State Agencies advocate two approaches for reducing the level of recovery of rate case expenses. State Agencies' primary recommendation is that ratepayers be charged for only 50% of total rate case expenses. State Agencies argue that this approach would recognize that shareholders, who reap benefits from a rate increase, ought to also share in the cost of obtaining that rate increase.[110]

- **The Results-Obtained Approach.** Alternatively, State Agencies advocate allowing ETI to recover only 26.4% of its rate case expenses, which is the ratio between the rate increase obtained in Docket 39896 ($27.7 million) and the increase sought by ETI ($104.8 million). In other words, because ETI obtained only 26.4% of the rate increase it sought, State Agencies contend that ETI similarly ought to be reimbursed for only 26.4% of its rate case expenses.[111] OPUC also advocates this approach.[112]

- **The Issue-Specific Reduction Approach.** Alternatively, OPUC and Staff advocate an approach whereby ETI's recovery of rate case expenses is reduced by the ratio between the amounts unsuccessfully sought by ETI for financially-based incentive payments and transmission equalization payments and the rate increase sought by ETI. ETI unsuccessfully sought financially-based incentive payments of $6.5

---

[107] Staff Init. Br. at 3; OPUC Init. Br. at 2-3, 7-8.

[108] Staff Init. Br. at 4; OPUC Init. Br. at 7.

[109] *See, e.g.*, Staff Reply Br. at 13.

[110] State Agencies Init. Br. at 3,

[111] State Agencies Init. Br. at 3, 22.

[112] OPUC Init. Br. at 11.

million, and transmission equalization payments of $9 million, for a total of $15.5 million. ETI sought a total rate increase of $104.8 million. Under this approach, $15.5 million would be divided by $104.8 million to arrive at a reduction factor of 14.8%. Thus, ETI's rate case expenses would be reduced by 14.8%.[113]

Not surprisingly, ETI vigorously opposes all of these approaches.

The ALJ agrees with the general concerns raised by Staff, State Agencies, and OPUC, and believes that a substantial cut to ETI's rate case expenses is warranted. Before evaluating the merits of the various approaches, however, it is helpful to revisit the applicable law relative to rate case expenses.

As noted previously, pursuant to PURA Section 36.061(b), the Commission "may" allow a utility to recover its "reasonable costs of participating in a [ratemaking proceeding] not to exceed the amount approved" by the Commission. This verbiage indicates that the Commission can approve some amount that is *less* than the reasonable costs. Section 36.061(b) vests the Commission with "broad discretion" to determine the amount of rate cases expenses that should be recovered,[114] and its determination can be set aside only if it acts without reference to guiding rules or principles.[115] There is precedent, albeit from a different agency, suggesting that it is within the agency's discretion to find overall rate case expenses to be unreasonable even if the underlying individual cost items are found to be reasonable.[116] Because Section 36.061(b) states that rate case expenses "may" be recovered, OPUC contends (and the ALJ agrees) that the Commission is not required to grant

[113] OPUC Init. Br. at 12; Staff Reply Br. at 3. OPUC identifies the reduction factor as 14.5%. However, the ALJ believes this is in error. OPUC witness Benedict testified that the financially-based incentive payments were **$6.2** million and the transmission equalization payments were $9 million, for a total of $15.2 million. Tr. at 85-86. By dividing $15.2 million by $104.8 million, one arrives at a reduction factor of 14.5%. However, the Commission disallowed $6.2 million in financially-based incentive compensation, *plus* $336,000 of ETI's capitalized financially-based incentive compensation, for a total of **$6.5** million in disallowances related to financially-based incentive payments. *Application of Entergy Texas, Inc. for Authority to Change Rates, Reconcile Fuel Costs, and Obtain Deferred Accounting Treatment,* Docket 39896, Order on Rehearing at 17-18, 24-25 (November 1, 2012).

[114] *City of El Paso v. Public Util. Comm'n,* 916 S.W.2d 515, 522 (Tex. App.-Austin 1995, writ dism'd by agr.).

[115] *City of Amarillo v. Railroad Comm'n of Texas,* 894 S.W.2d 491, 495 (Tex. App.-Austin 1995, writ den.).

[116] *City of Port Neches v. Railroad Comm'n of Texas,* 212 S.W.3d 565, 581 (Tex. App.-Austin 2006, no pet.)

recovery of every reasonable expense and can take into account other considerations. As explained by OPUC, "[w]ithout this discretion, rate case expense proceedings would be rendered into mere accounting exercises."[117] A number of factors--such as the time and labor required; the nature of the case; the size of the interest at stake; and the benefits to the client--have been deemed relevant to determining the reasonableness of rate case expenses.[118] Moreover, the parties agree that Rule 1.04(b) of the Texas Disciplinary Rules of Professional Conduct also provides a number of factors that can be considered when determining reasonableness of rate case expenses.[119]

With these basic parameters in mind, the ALJ turns to evaluating the three approaches outlined above. The ALJ begins by rejecting the 50/50 Approach. ETI and Staff argue that the approach is contrary to Commission precedent.[120] The ALJ agrees. Given that there are clear Commission precedents rejecting this approach, the ALJ recommends that it be rejected here.

The ALJ also recommends rejection of the Results-Obtained Approach, while acknowledging that it has some strong arguments in its favor. ETI argues that the approach is counter to Commission precedent.[121] However, according to Staff, the approach has been neither adopted nor rejected by the Commission. In other words, it is an issue of first impression.[122] OPUC and State Agencies support the use of this approach. It is unclear whether Staff explicitly supports this approach. However, Staff describes it as an "appealing" methodology "because it would provide a utility an incentive not to overreach in its rate increase request."[123] Moreover, Staff argues that the methodology is akin to the performance-based standards regarding generation plant performance that

---

[117] OPUC Init. Br. at 11.

[118] *City of El Paso*, 916 S.W.2d at 522.

[119] ETI Ex. 8 (Morris Direct) at 18-19.

[120] Staff Init. Br. at 10; ETI Init. Br. at 19-20.

[121] ETI Init. Br. at 14.

[122] Staff Init. Br. at 10.

[123] Staff Init. Br. at 12.

the Commission has approved in the past. For these reasons, Staff concludes that the Commission has the legal authority to apply the Results-Obtained Approach in this case.[124]

ETI complains, however, that it is a punitive and hindsight-driven approach to cost recovery, rather than basing cost recovery on whether a utility acted reasonably at the time it incurred such costs.[125] This is the primary reason why the ALJ recommends against the Results-Obtained Approach. Because it is an issue of first impression, ETI had no prior notice that its rate case expenses might be subject to such a standard. The ALJ simply believes it would be unacceptably draconian to slash ETI's rate case expenses by 73.6% based upon a standard that ETI could not have known, beforehand, would be applied to it.

The ALJ recommends adoption of the Issue-Specific Reduction Approach in this case. Staff, OPUC, and State Agencies all support its use. ETI argues that use of the approach is unprecedented.[126] Staff counters (and the ALJ agrees) that, far from being unprecedented, the approach is entirely consistent with Commission precedent because the disallowance is a result of specific, unreasonable actions by ETI.[127]

ETI argues that the Issue-Specific Reduction Approach is improper because there is no evidence that the 14.8% reduction equals the amount of expenses it incurred pursuing financially-based incentive costs and transmission equalization payments.[128] Staff counters (and the ALJ agrees) that ETI bore the burden of proving its reasonable expenses, and that burden necessarily requires that it separate out any unreasonable expenses. Having failed to do so with respect to financially-based

---

[124] Staff Init. Br. at 11.

[125] ETI Init. Br. at 17.

[126] ETI Init. Br. at 19.

[127] Staff Init. Br. at 14.

[128] ETI Init. Br. at 18.

incentives and transmission equalization payments, it is reasonable for the Commission to use the Issue-Specific Reduction Approach as a proxy for calculating those expenses.[129]

There is also a point of disagreement as to the proper application of the Issue-Specific Reduction Approach. ETI argues that the proponents of the approach are using the wrong denominator in its formulation. Rather than dividing $15.5 million by $104.8 million (the size of the *rate increase* sought by ETI), ETI asserts that $15.5 million ought to be divided by $2.1 billion (the size of *all* of ETI's costs). ETI explains that, in Docket 39896, it was obligated to prove all of its costs, not just the amount of the increase it sought. Under such a formula, the reduction factor would be less than 1%.[130] As pointed out by Staff and OPUC,[131] ETI's reasoning is flawed. The entire purpose of this proceeding was for ETI to obtain a rate increase, not to preserve its preexisting rates. Indeed, the petition is styled "Application . . . for Authority to *Change* Rates . . . ."[132] There would have been no need for a rate case if ETI merely sought approval of the same level of revenue approved in the last rate case. Because a revenue increase was the driving factor for this case, the amount of revenue increase requested is the appropriate benchmark to compare against disallowances.

Having concluded that the Issue-Specific Reduction Approach should be utilized in this case, the ALJ now discusses the application of the formula to the rate case expenses. As explained in the second paragraph of Section IV.C of this PFD, in order to take into account the $75,800 of estimated expenses for Cities, the ALJ recommends increasing ETI's overall rate case expenses request to $8,828,345. From that amount, the ALJ subtracts the specific disallowances discussed in Section IV.C.1 of this PFD:

---

[129] Staff Init. Br. at 15.

[130] ETI Init. Br. at 18.

[131] Staff Reply Br. at 12; OPUC Reply Br. at 4-5.

[132] Emphasis added.

- $207,683 for depreciation;

- $281 meals over $25;

- $10 for clothing;

- $40 for laundry service; and

- $480 lodging.

This leaves a balance of $8,619,851. When that balance is reduced by 14.8%, the remainder is $7,344,113. It is this amount of rate case expenses that the ALJ recommends ETI be allowed to recover.

## D.    Recovery Method

### 1.    Rate Case Expense Allocation and the Recovery Mechanism

ETI proposes to allocate the approved rate case expenses among its retail classes using a revenue allocator based upon ETI's pro forma Test Year revenues. Staff proposes, instead, that the allocation be based on each retail rate classes's revenue requirement as approved by the Commission. Staff argues that its approach would be more consistent with recent Commission precedent.[133] Staff's specific recommendation is as follows:

> [T]hat ETI's Schedule RCE-2 rates be set in the compliance phase of this proceeding by multiplying the approved total amount by Staff's recommended class allocator and dividing the resulting class share both by ETI's proposed three-year amortization period and also by ETI's proposed class billing determinants.[134]

---

[133] Staff Init. Br. at 17; Staff Ex. 1 (Murphy Direct) at 4-5.

[134] Staff Ex. 1 (Murphy Direct) at 5.

Staff further recommends that ETI be required to track its collections on Rider RCE and terminate billing in the month in which the approved amount has been billed.[135] ETI does not object to Staff's approach to allocation, so long as the Commission's final order includes standard language allowing the company to seek recovery of any additional rate case expenses incurred after September 30, 2012, in its subsequent rate case.[136] Staff does not object to this request by ETI.[137] No other party objects to this approach, and the ALJ can find no reason to do so either.

## 2. ETI's Request to Earn a Return on the Unpaid Balance of Rate Case Expenses

ETI asks that it be allowed to recover its rate case expenses over three years, and that it be allowed to recover a return on the unpaid balance of the expenses during that time.[138] No party objects to the three-year duration, but Staff opposes ETI's request to earn interest on its rate case expenses, contending that the Commission has consistently refused the recovery of a return on unamortized rate case expenses.[139] State Agencies agree with Staff.[140]

ETI responds by arguing that it is simply seeking to recover a necessary component of a cost that is amortized over a period of time. According to ETI, the request for a return on the unpaid balance merely represents the time value of money and the cost of the company's lost opportunity to use the funds elsewhere.[141] ETI cites to several Commission precedents in which a utility was allowed to recover interest on various cost-of-service items, including Docket 39896, in which ETI was allowed to earn a return on the unamortized balance of its Hurricane Rita Regulatory Asset over

---

[135] Staff Ex. 1 (Murphy Direct) at 5.

[136] ETI Ex. 7 (Considine Rebuttal) at 5.

[137] Staff Init. Br. at 18.

[138] ETI Ex. 5 (Considine Rebuttal) at 7.

[139] Staff's Init. Br., pp. 5-6.

[140] State Agencies' Reply Br., pp. 3, 16.

[141] ETI's Reply Br., pp. 23-24.

five years.[142] ETI does not, however, cite to any Commission precedent specifically authorizing a return on unpaid rate case expenses.

Staff has the better argument. In Docket 30706, CenterPoint Energy Houston Electric (CenterPoint) sought to recover its rate case expenses over three years with a return on the unpaid balance. The Commission rejected CenterPoint's request for a return, explicitly noting its "practice of not permitting utilities to receive interest on unpaid rate-case expenses."[143] Consistent with this clear Commission precedent, the ALJ recommends that ETI's request to recover a return on the unpaid balance of its rate case expenses during the three-year payoff period be denied.

## V.    CONCLUSION

The ALJ recommends that the Commission implement the findings of the ALJ set forth in the discussion above by adopting the following proposed findings of fact and conclusions of law in the Commission's final order.

## VI.    PROPOSED FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDERING PARAGRAPHS

### A.    Findings of Fact

1.    Entergy Texas, Inc. (ETI or the Company) is an investor-owned electric utility with a retail service area located in southeastern Texas.

2.    On November 28, 2011, ETI filed an application (the ETI Application) requesting, among other things, approval of a proposed increase in annual base rate revenues of approximately $111.8 million over adjusted test year revenues, and a new rider for recovery of costs related to purchased power capacity.

---

[142] Docket 39896, Proposal for Decision at 17-23; see also, Petition of Texas-New Mexico Power Company for Approval of Regulatory Asset Treatment of Expenses Related to System Benefit Fund Payments, Docket No. 26942, Order at 4 (Findings of Fact 26-29)(Aug. 22, 2003).

[143] Application of CenterPoint Energy Houston Electric, LLC for a Competition Transition Charge, Docket No. 30706, Order at 32 (Jul. 14, 2005).

3.   On November 29, 2011, the Public Utility Commission of Texas (Commission or PUC) referred the ETI Application to the State Office of Administrative Hearings (SOAH) for a hearing and the matter was assigned docket number 39896 (Docket 39896).

4.   On April 4, 2012, in Docket 39896, the ALJs issued SOAH Order No. 13 severing rate case expense issues into a new docket, the case at issue here, *Application of Entergy Texas, Inc. for Rate Case Expenses Severed from PUC Docket No. 39896*, Docket No. 40295.

5.   The hearing on the merits in Docket 39896 was held in April-May 2012.

6.   The Proposal for Decision (PFD) in Docket 39896 was issued July 6, 2012.

7.   The Commission issued its final order in Docket 39896 on November 2, 2012.

8.   The hearing on the merits in the present docket, Docket 40295, was held on November 28, 2012. The record closed on December 21, 2012, following the filing of post-hearing briefs.

9.   The following parties were granted intervenor status in this docket: Office of Public Utility Counsel (OPUC); the cities of Anahuac, Beaumont, Bridge City, Cleveland, Conroe, Dayton, Groves, Houston, Huntsville, Montgomery, Navasota, Nederland, Oak Ridge North, Orange, Pine Forest, Rose City, Pinehurst, Port Arthur, Port Neches, Shenandoah, Silsbee, Sour Lake, Splendora, Vidor, and West Orange (Cities); State Agencies (State Agencies); and Texas Industrial Energy Consumers (TIEC). The staff (Staff) of the Commission was also a participant in this docket.

10.  In Docket 39896, ETI adjusted its request for a proposed increase in annual base rate revenues to approximately $104.8 million over adjusted Test Year revenues.

11.  In the PFD in Docket 39896, the ALJs recommended an overall rate increase of $28.3 million.

12.  In its final order in Docket 39896, the Commission largely followed the recommendations contained in the PFD, but reduced ETI's overall rate increase to $27.7 million.

13.  In this docket, ETI seeks to recover $8.8 million in rate case expenses associated with Docket 39896.

14.  Of that total, $7.6 million was incurred by ETI and $1.2 million was incurred by Cities.

15.  Cities proved that, through August 31, 2012, they reasonably incurred rate case expenses of $1,125,768.61 in Docket 39896 and this docket.

16.  Cities reasonably estimated that their total rate case expenses in Docket 39896 and this docket after August 31, 2012 will total $75,800.

17.   The amount of rate case expenses sought by ETI ($8.8 million) is high, both in absolute terms, and in relation to the rate increase ultimately obtained by ETI in Docket 39896 ($27.7 million).

18.   Rate case expenses for ETI in the amount of $7,344,113 are reasonable and necessary and should be allowed as a cost or expense by the Company. This amount is calculated by reducing the requested amount by the amounts listed and for the reasons stated below:

   a.   $207,683 in depreciation of office equipment owned by Entergy Services, Inc. (ESI) (an affiliated company of ETI) and used by ESI employees for their work in Docket 39896 is not reasonable and is properly disallowed.

   b.   $281 for meals over $25 was erroneously sought by ETI, is not reasonable, and is properly disallowed.

   c.   $10 for clothing purchased by an attorney for ETI is not reasonable and is properly disallowed.

   d.   $40 for laundry charges by an attorney for ETI is not reasonable and is properly disallowed.

   e.   $480 for a lodging charge unsupported by receipts is not reasonable and is properly disallowed.

   f.   $1,275,738 attributable to unreasonable and overly aggressive arguments pursued by ETI in Docket 39896 related to financially-based incentive compensation and transmission equalization payments is properly disallowed.

## B.   Conclusions of Law

1.   ETI is a "public utility" as that term is defined in the Public Utility Regulatory Act (PURA) § 11.004(1) and an "electric utility" as that term is defined in PURA § 31.002(6).

2.   The Commission exercises regulatory authority over ETI and jurisdiction over the subject matter of this application pursuant to PURA §§ 32.001, 32.101, 33.002, 33.051, and 36.101-111.

3.   SOAH has jurisdiction over matters related to the conduct of the hearing and the preparation of a proposal for decision in this docket, pursuant to PURA § 14.053 and Tex. Gov't Code § 2003.049.

4.   This docket was processed in accordance with the requirements of PURA and the Texas Administrative Procedure Act, Tex. Gov't Code Chapter 2001.

5.    Pursuant to PURA § 33.051, the Commission has jurisdiction over an appeal from a municipality's rate proceeding.

6.    Cities bore the burden to prove that the rate case expenses they incurred were reasonable. PURA § 33.023.

7.    Cities are entitled to reimbursement by ETI for:

   a.    rate case expenses of $1,125,768.61 incurred in Docket 39896 and this docket through August 31, 2012; and

   b.    actual expenses incurred by Cities in Docket 39896 and this docket after August 31, 2012, including any appeals, up to a maximum possible amount of $75,800.

8.    ETI bore the burden of proving that the rate case expenses it incurred in Docket 39896 were reasonable. PURA § 36.061(b).

9.    ETI proved the reasonableness of its rate case expenses in the amount of $7,344.113, and is entitled to claim that amount as a cost.

## C.    Proposed Ordering Paragraphs

In accordance with these findings of fact and conclusions of law, the Commission issues the following orders:

1.    The Proposal for Decision prepared by the SOAH ALJs is adopted to the extent consistent with this Order.

2.    All other motions, requests for entry of specific findings of fact and conclusions of law, and any other requests for general or specific relief, if not expressly granted, are denied.

3.    Cities' and ETI's requests to recover rate case expenses are granted to the extent consistent with this Order.

**SIGNED February 19, 2013.**

HUNTER BURKHALTER
ADMINISTRATIVE LAW JUDGE
STATE OFFICE OF ADMINISTRATIVE HEARINGS

# APPENDIX D



Control Number: 31433



Item Number: 32

Addendum StartPage: 0

**DOCKET NO. 31433**

| PROCEEDING TO CONSIDER RATE | § | PUBLIC UTILITY COMMISSION |
|---|---|---|
| CASE EXPENSES SEVERED FROM | § | |
| DOCKET NO. 28840 (APPLICATION OF | § | |
| AEP TEXAS CENTRAL COMPANY FOR | § | OF TEXAS |
| AUTHORITY TO CHANGE RATES) | § | |
| | § | |

**ORDER**

This Order addresses the recoverable rate-case expenses of AEP Texas Central Company (AEP Central) and of Cities[1] in connection with their participation in Docket No. 28840.[2] As set forth in this Order, the Public Utility Commission of Texas (Commission) determines that AEP Central's recoverable rate case expenses through June 2005 are $2,938,130 and that Cities' recoverable rate case expenses are $1,350,149. As discussed herein, the Cities' expenses relating to witness Sarah Goodfriend have been reduced by one-half as recommended by the State Office of Administrative Hearings (SOAH) Administrative Law Judges in their Proposal for Decision (PFD) in Docket No. 28840.[3] This Order finds that $4,288,429 in rate-case expenses incurred by AEP Central and Cities is reasonable and necessary and authorizes AEP Central to implement a surcharge over three years to recover this amount.

**I. Procedural History**

On November 3, 2003, AEP Central filed an application seeking a change in its rates. This application was assigned Docket No. 28840, and the Commission referred the case to SOAH on November 4, 2003. SOAH issued its initial PFD in Docket No. 28840 on July 1, 2004, which contained certain findings on rate case expenses. In July and August 2004, the Commission issued two orders on remand in Docket No 28840 directing SOAH to consider further and provide further evaluation of certain specified issues, none of which involved rate case expenses. On November

---

[1] Alice, Aransas Pass, Carrizo Springs, Dilley, Donna, Eagle Lake, Freer, Ganado, George West, Ingleside, Kingsville, LaFeria, Laguna Vista, La Joya, Leakey, Los Fresnos, Lyford, Lytle, McAllen, Mercedes, Mission, Nordheim, Odem, Pharr, Port Aransas, Portland, Port Lavaca, Poteet, Rancho Viejo, Refugio, Rio Hondo, Runge, San Benito, San Juan, Sinton, Uvalde, and Weslaco (collectively, Cities).

[2] *Application of AEP Texas Central Company for Authority to Change Rates,* Docket No. 28840, Order (Aug. 15, 2005).

[3] Docket No. 28840, Proposal for Decision at 121-127, 205 (FOF 210-216), 209 (FOF 256) (Jul. 1, 2004).

16, 2004, SOAH issued its Remand PFD. In addition, the Commission held hearings on certain matters relating to merger savings and affiliated expenses on March 3, 4, and 7. The Commission issued its final order in Docket No. 28840 on August 15, 2005. In that order, the Commission severed the determination of the reasonableness and necessity of rate case expenses to this proceeding, Docket No. 31433.[4] While rate-case expenses were not addressed on the remand SOAH hearing and the Commission-held hearing, Cities and AEP incurred additional expenses as a result of these hearings, and submitted updated information on these additional expenses. Based on the submission, the Commission decided to sever the determination on rate-case expenses to examine this additional evidence.[5]

By Order No. 1 in this proceeding, AEP Central and Cities were directed to file detailed supporting documentation of their requested rate case expenses. On September 9, 2005, AEP Central and Cities filed such supporting documentation. On September 16 and October 10, 2005, AEP Central made supplemental filings that furnished additional supporting documentation with respect to certain of its requested expenses.

On October 14, 2005, the parties filed statements of position and on October 28, 2005, AEP Central filed its Motion for Ruling on Disputed Issue and Conditional Request for a Hearing. On December 12, 2005, the presiding officer issued Order No. 4, which requested clarification regarding contested issues. On December 22, 2005, the parties filed responses to Order No. 4.

The parties' filings established that there are no contested factual issues in Docket No. 31433 that have not been fully litigated in Docket No. 28840. To the extent AEP Central had previously conditionally requested a hearing, that request was withdrawn by AEP Central's December 22, 2005 filing. The sole disputed issue is the recoverability of one-half of Cities' witness Sarah Goodfriend's expenses, which the SOAH ALJs had recommended be disallowed in their PFD in Docket No. 28840 issued on July 1, 2004. Since there are no contested factual issues that have not already been fully litigated, an evidentiary hearing on the merits is not necessary or appropriate. The disposition of the sole contested issue is discussed in the subsequent section of this Order.

---

[4] Docket No. 28840, Order at 60 (Ordering ¶ 5) (Aug. 15, 2005).

[5] Open Meeting Tr. at 54-62 (July 29, 2005).

## II. Recoverability of One-Half of Dr. Goodfriend's Expenses

In Docket No. 28840, AEP Central submitted testimony challenging the quality of a survey that formed the basis of testimony submitted by Cities witness, Dr. Sarah Goodfriend.[6] Following a full evidentiary hearing and briefing on this and other issues, the SOAH ALJs recommended that one-half of Dr. Goodfriend's expenses be disallowed because they found that the methodology of the survey she conducted was "seriously flawed."[7]

In severing the issue of rate case expenses from Docket No. 28840 to this proceeding, the Commission intended that the entire evidentiary record in Docket No. 28840 on rate case expenses as well as the Commission's initial decisions be carried over to this case. Thus, the evidentiary record on the quality of Dr. Goodfriend's work underlying her testimony in Docket No. 28840 and the SOAH ALJs' findings regarding the recoverability of one-half of her expenses are before the Commission for decision in this proceeding. The purpose of the severance, however, was to evaluate the detailed supporting documentation on updated rate-case expenses submitted by AEP Central and Cities.[8] This proceeding was not initiated as a forum for Cities to re-litigate Dr. Goodfriend's expenses.

The Commission had previously found that the ALJs correctly determined that one-half of Dr. Goodfriend's expenses should be disallowed[9] because the survey she conducted "was seriously flawed and that conclusions drawn from the data cannot be reasonably supported under current legal standards."[10] The Commission reaffirms this determination, and therefore, the Commission adopts the SOAH ALJs' finding that one-half of Dr. Goodfriend's expenses should be disallowed. In addition, as there are no other outstanding contested issues related to the rate-case expense information submitted in Docket No. 28840 or the additional rate-case expense information

---

[6] *See* Docket No. 28840, Proposal for Decision at 121-127, 205 (FOF 212) (Jul. 1, 2004).

[7] *Id.* at 125.

[8] *See* Open Meeting Tr. at 62 (Jul. 29, 2005).

[9] Open Meeting Tr. at 196-198 (January 13, 2005).

[10] Docket No. 28840, Proposal for Decision at 125 (Jul. 1, 2004).

submitted in this docket, the Commission finds that the rate-case expenses of $2,938,130 for AEP Central and $1,350,299 for Cities are reasonable and necessary.

### III. The SOAH ALJs' Findings and Conclusions in Docket No. 28840

In the PFD issued on July 1, 2004, in Docket No. 28840, the SOAH ALJs included Finding of Fact Nos. 210 through 216 and Conclusion of Law No. 58 addressing rate case expenses. The SOAH ALJs' findings were issued prior to the updating by AEP Central and Cities of their rate case expenses in their filings described in Finding of Fact No. 15. Thus, in order to reflect the updated factual evidence filed in Docket No. 31433 and certain other corrections described below, the Commission modifies the SOAH ALJs' Finding of Fact Nos. 210 through 216 as follows.

Finding of Fact Nos. 22 through 25 of this Order modify the SOAH ALJs' Finding of Fact No. 210 to reflect the updated amounts of rate case expenses found reasonable and necessary for AEP Central after reflecting the disallowance recommended by Staff. Finding of Fact No. 27 of this Order modifies the SOAH ALJs' Finding of Fact No. 211 to reflect the updated amount of Cities' requested rate case expenses. Finding of Fact Nos. 28 and 29 of this Order modify the SOAH ALJs' Finding of Fact No. 212 to reflect the updating of Dr. Goodfriend's portion of Cities' requested rate case expenses. Finding of Fact Nos. 31 and 32 of this Order adopt the SOAH ALJs' Finding of Fact Nos. 214 and 215. Finding of Fact No. 33 of this Order modifies the SOAH ALJs' Finding of Fact No. 216 to reflect the amounts found reasonable and necessary by the Commission based on the updated information in this proceeding and corrects it to reflect that the rate case expenses will be collected through a three-year surcharge and not through cost of service. Finding of Fact No. 34 of this Order supplements the SOAH ALJs' Finding of Fact No. 256 to reflect the updated amounts for AEP Central's and Cities' rate case expenses found reasonable and necessary by this Order. Finding of Fact No. 35 reflects the Commission's policy decision, in accordance with its decision in Docket No. 30706,[11] that AEP Central not be permitted to recover estimated appeal costs in this proceeding, but that AEP Central be afforded the opportunity to recover in its next rate case any reasonable and necessary expenses for Docket Nos. 28840 and 31433 that it

---

[11] *Application of CenterPoint Energy Houston Electric, LLC for a Competition Transition Charge*, Docket No. 30706, Order at 28-29, 47 (COL 28) (Jul. 14, 2005).

subsequently incurs that exceed the amounts found reasonable and necessary by this Order. Finally, Conclusion of Law No. 6 in this Order incorporates the SOAH ALJs' Conclusion of Law No. 58.

The Commission adopts the following findings of fact and conclusions of law:

## IV. Findings of Fact

### A. Background and Procedural Matters

1. AEP Central is an electric utility providing transmission and distribution (T&D) services in a 44,000 square-mile area of South Texas that includes the portion of Texas from just south of San Antonio to the Mexican border and from Bay City west to Eagle Pass. AEP Central's service area is located within the Electric Reliability Council of Texas (ERCOT).

2. On November 3, 2003, AEP Central filed an application with the Commission to change its T&D rates. The Commission assigned AEP Central's application to Docket No. 28840.

3. Concurrent with filing its application with the Commission, AEP Central filed a similar petition and statement of intent with each incorporated city in its certificated service area that retains jurisdiction over its retail rates. Eighty-six (86) cities denied AEP Central's petition and statement of intent. AEP Central filed petitions for review of those denials and filed motions to consolidate those petitions for review into Docket No. 28840.

4. On November 4, 2003, the Commission referred AEP Central's application in Docket No. 28840 to SOAH to conduct an evidentiary hearing on the merits and issue a PFD.

5. The following parties intervened and participated in the hearing in Docket No. 28840: Cities; Texas Industrial Energy Consumers (TIEC); CPL Retail Energy (CPL Retail); Coalition of Commercial Ratepayers (CCR); City of Garland, Alliance for Retail Markets (ARM); TXU Business Services (TXU); Texas Legal Services Center and Texas Ratepayers' Organization to Save Energy (TLSCROSE); South Texas Electric Cooperative, Inc. (STEC); State of Texas; Office of Public Utility Counsel (OPC); and Commission Staff (Staff).

6.      In Docket No. 28840, AEP Central requested approval of a revenue requirement of $519.9 million, based on an historical test year of July 1, 2002, through June 30, 2003. Of that amount, $426.6 million was for providing retail T&D service (including the portion of the ERCOT-wide transmission costs) and $93.3 million for providing wholesale transmission service.

7.      The evidentiary hearing on the merits in Docket No. 28840 was held on March 2 through March 18, 2004.

8.      On July 1, 2004, the SOAH ALJs assigned to hear Docket No. 28840 issued their PFD. The PFD contained certain findings with respect to rate case expenses.

9.      The Commission issued orders on July 28 and August 25, 2004, remanding portions of Docket No. 28840 to SOAH, none of which involved rate case expenses.

10.     On November 16, 2004, the SOAH ALJs issued their Remand PFD in Docket No. 28840.

11.     On March 3, 4, and 7, 2005, the Commission held hearings on merger savings and affiliate expenses.

12.     On August 15, 2005, the Commission issued its final order in Docket No. 28840. In Ordering Paragraph 5 of that order, the Commission severed the determination of the reasonableness and necessity of rate case expenses into this proceeding, Docket No. 31433. All portions of the evidentiary record in Docket No. 28840 relevant to rate case expenses are part of the evidentiary record in this Docket No. 31433.

13.     On August 26, 2005, the presiding officer issued Order No. 1, which required the parties to file evidence of rate case expenses and directed AEP Central and Cities to file supporting detailed documentation for their requested rate case expenses. Order No. 1 also made all parties to Docket No. 28840 parties to this proceeding.

14. On August 29, 2005, Cities requested clarification from the presiding officer regarding the extent of the supporting documentation the Cities were required to submit under Order No. 1.

15. On August 30, 2005, Order No. 2: Clarification of Order No. 1, was issued informing Cities that:

> The entirety of the rate case expenses will be considered in this proceeding. To the extent supporting documentation for expenses prior to September 2004 is in the record of Docket No. 28840, Cities may simply provide the relevant cite to the record. If the supporting documentation for expenses is not in the Docket No. 28840 record, that information should be submitted in this proceeding.

16. On September 9, 2005, AEP Central and Cities filed supporting documentation for their requested rate case expenses, consisting of invoices, timesheets, receipts, etc. On September 16 and October 10, 2005, AEP Central filed supplemental information related to certain of its requested rate case expenses.

17. On September 19, 2005, the presiding officer established a procedural schedule for this docket. In accordance with the procedural schedule, statements of position were due on October 14, 2005, and requests for hearing were due on October 28, 2005.

18. On October 14, 2005, AEP Central, Cities, and Staff filed statements of position. In its statement of position, Staff questioned certain items of AEP Central's rate case expenses as lacking adequate supporting documentation. In its statement of position, AEP Central stated that the SOAH ALJs had recommended that one-half of Dr. Goodfriend's expenses be disallowed and noted that Cities' requested rate case expenses included the entire amount billed by Dr. Goodfriend to Cities, and not one-half of that amount. In its statement of position, Cities indicated that they did not contest any of AEP Central's rate case expenses, but indicated that if Cities' request associated with Dr. Goodfriend's work was contested, then Cities would urge that the standard applied to Dr. Goodfriend be applied to AEP Central's experts.

19.   On October 28, 2005, AEP Central filed a motion for ruling on a disputed issue and conditionally requested a hearing seeking a Commission ruling on whether, by severing rate case expenses from Docket No. 28840, it intended to reopen for litigation the issue of Dr. Goodfriend's expenses which had been fully litigated in Docket No. 28840. AEP Central's pleading also included an identification of the portions of the record in Docket No. 28840 that addressed the issue of the quality of Dr. Goodfriend's work and the recovery of her rate case expenses.

20.   On December 12, 2005, the presiding officer issued Order No. 4, which requested a clarification regarding a contested issue and directed Staff to file a list of disputed factual issues and a list of threshold legal and policy issues that must be addressed before this proceeding can be resolved, and permitting AEP Central and Cities to make similar filings.

21.   On December 22, 2005, AEP Central and Cities filed their responses to Order No. 4. In its response, AEP Central withdrew its conditional request for a hearing.

22.   Based on the filings of the parties set forth in Finding of Fact Nos. 16, 18, 19, and 21, the Commission finds that no factual matters that have not already been fully litigated in Docket No. 28840 are at issue or disputed. The only disputed issue in this proceeding involves the recoverability of one-half of Cities' witness Goodfriend's expenses, which has been subjected to a full contested case evidentiary hearing, briefing, and the issuance by the SOAH ALJs of a PFD in Docket No. 28840.

**B.   AEP Central's Rate Case Expenses**

23.   Based on its filing of September 9, 2005, as supplemented by its filings of September 16 and October 10, 2005, AEP Central sought recovery of $2,962,734 in recoverable rate case expenses for Docket No. 28840 through June 2005.

24.   In its statement of position filed on October 14, 2005, Staff questioned whether $24,604 of AEP Central's requested rate case expenses were supported by adequate underlying documentation and recommended disallowance of these expenses.

25.    In its filing of October 28, 2005, AEP Central indicated that it did not contest Staff's recommendation to disallow $24,604 of AEP Central's requested rate case expenses.

26.    AEP Central's reasonable and necessary rate case expenses for Docket No. 28840 as of June 2005 are $2,938,130.

C.    **Cities' Rate Case Expenses**

27.    In its filing of September 9, 2005, Cities requested rate case expenses for Docket No. 28840 of $1,391,925. This amount consisted of $1,166,925 in expenses actually incurred through July 2005 and $225,000 in estimated expenses including appeals.

28.    Cities' actual expenses of $1,166,925 through July 2005 included $83,253 billed by Cities' witness Sarah Goodfriend.

29.    The Commission adopts the SOAH ALJs' finding regarding disallowance of one-half of Dr. Goodfriend's expenses from Docket No. 28840 because of the inadequacies in the survey she performed. The record indicates that Dr. Goodfriend has billed the Cities $83,253; therefore a disallowance of one-half of her fees is $41,626.

30.    Based on Findings of Fact Nos. 27 through 29, Cities' recoverable rate case expenses are $1,350,299.

31.    AEP Central's proposal to disallow Cities' witness Starnes expenses is not appropriate because the principal rate design issues raised by Cities benefit other rate payers.

32.    Cities' rate case expenses are system costs that should be borne by all ratepayers because other ratepayers benefit from the Cities' participation.

D.    **Rate Case Expense Surcharge**

33.    Based on Finding of Fact Nos. 26 and 30, the aggregate amount of rate case expenses found reasonable and necessary for AEP Central and Cities are $4,288,429.

34. It is appropriate for AEP Central to surcharge the aggregate rate case expenses found reasonable and necessary in Finding of Fact No. 33 to be collected from all customers over three years.

### E. Subsequent Rate Case Expenses

35. To the extent AEP Central incurs rate case expenses for Docket Nos. 28840 and 31433 after June 2005, it is reasonable for it to recover such expenses in its next rate case to the extent it demonstrates that such additional expenses are reasonable and necessary. Also, to the extent that Cities incur rate case expenses for Docket Nos. 28840 and 31433 after July 2005 that cause Cities' aggregate rate case expenses to exceed the amount found recoverable by this Order, it is reasonable for AEP Central to recover such expenses in its next rate case to the extent found reasonable and necessary.

## V. Conclusions of Law

1. AEP Central is an electric utility as defined by §§ 31.002 of the Public Utility Regulatory Act, TEX. UTIL. CODE ANN. §§ 11.001-66.017 (Vernon 1998 & Supp. 2005) (PURA) and is therefore subject to the Commission's jurisdiction under PURA §§ 32.001, 33.051, and 36.102.

2. AEP Central is a T&D utility as defined in PURA § 31.002(19).

3. SOAH had jurisdiction over all matters relating to the conduct of the hearing in Docket No. 28840, including the preparation of a Proposal for Decision pursuant to PURA § 14.053 and TEX. GOV'T CODE ANN. § 2003.049(b).

4. AEP Central met its burden of proof regarding the amount of its rate case expenses for Docket No. 28840 through June 2005 found reasonable and necessary in Finding of Fact No. 26.

5. With the exception of the Cities' rate case expenses disallowed in Finding of Fact No. 29, Cities met their burden of proof that their rate case expenses for Docket No. 28840 are reasonable and necessary.

6. Cities are entitled to reimbursement for their rate case expenses as customers, as well as for being regulatory authorities.

7. The evidentiary record in Docket No. 28840 on rate case expenses, including the portion related to the quality of work performed by Dr. Goodfriend underlying her testimony submitted in Docket No. 28840 identified in AEP Central's pleading described in Finding of Fact No. 19, is part of the evidentiary record in this case together with the additional supporting documentation filed by AEP Central and Cities in this proceeding as discussed in Finding of Fact No. 16.

8. No contested issues of fact beyond those that were fully litigated, argued, and heard by the SOAH ALJs in Docket No. 28840 have been raised in this proceeding; therefore, there is no need for any further evidentiary hearing on the merits on recoverable rate case expenses in addition to those already held in Docket No. 28840.

9. When the issue of the quality of the work underlying Dr. Goodfriend's testimony in Docket No. 28840 was litigated before and the issue of the recoverability of her rate case expenses was briefed to the SOAH ALJs, Cities had the opportunity to challenge the quality of AEP Central's experts' substantive work and the recovery of their rate case expenses under the standard applied by the SOAH ALJs to Dr. Goodfriend's expenses. Cities failed to take advantage of that opportunity and no additional evidentiary hearing on the merits is appropriate in this proceeding as to that matter.

## VI. Ordering Paragraphs

In accordance with these findings of fact and conclusions of law, the Commission issues the following Order:

1. The additional supporting documentation filed by AEP Central and Cities on September 9, 2005, and by AEP Central on September 16 and October 10, 2005, as discussed in Finding of Fact No. 16 above, is admitted into the evidentiary record of this Docket No. 31433.

2. To the extent provided in this order, the requests by AEP Central and Cities for determination of their reasonable and necessary rate case expenses for Docket No. 28840 are granted.

3. As set forth in Finding of Fact No. 34, AEP Central is authorized to surcharge, over a three-year period, the aggregate rate case expenses for Docket No. 28840 found reasonable and necessary in Finding of Fact No. 33.

4. AEP Central shall file tariff sheets consistent with this Order (compliance tariff) no later than 20 days after receipt of this Order. The Compliance tariff, and all filings related to it, shall be filed in Tariff Control Number 32385 and shall be styled: *Compliance Tariff of AEP Texas Central Company Pursuant to Final Order in Docket No. 31433 Severed from Docket No. 28840.* The Filing shall include a transmittal letter stating that the tariffs attached are in compliance with this Order, giving the docket number, date of this Order, a list of tariff sheets filed, and any other necessary information. The timetable for review of the compliance tariff shall be established by the Commission's ALJ assigned to the tariff. In the event any sheets are modified or rejected, AEP Central shall file proposed revisions to those sheets in accordance with the Commission's ALJ. All subsequent filings in connection with the compliance tariff (*i.e.,* requests for extensions, textual corrections, revisions) shall be filed in the Tariff Control Number provided above, and styled as set forth above. After issuance of the final order, no further filings other than those pertaining to a motion for rehearing shall be made in this docket.

5. As set forth in Finding of Fact No. 35, AEP Central may seek to recover in its next rate case expenses in connection with Docket Nos. 28840 and 31433 that it incurs after June 2005 and Cities' rate case expenses incurred in connection with Docket No. 28840 and 31433 that

exceed the amounts authorized to be recovered herein, to the extent such additional expenses are found reasonable and necessary.

6.     All other motions, requests for entry of specific findings of fact and conclusions of law, and any other requests for general or specific relief, if not expressly granted herein, are denied.

SIGNED AT AUSTIN, TEXAS the _3rd_ day of _March_ 2006.

PUBLIC UTILITY COMMISSION OF TEXAS

_____
PAUL HUDSON, CHAIRMAN

_____
JULIE PARSLEY, COMMISSIONER

_____
BARRY T. SMITHERMAN, COMMISSIONER

q:\cadm\orders\final\31000\31433fo.doc

# APPENDIX E

ENTERGY TEXAS, INC.
RATE CASE EXPENSES PAID AND ACCRUED THROUGH THE MONTH ENDED SEPTEMBER 30, 2012
ETI 6/30/11 COS    DOCKET 39896 RATE CASE EXPENSES    STAFF DATA REQUEST 9-1 ADDENDUM 3

| | AMOUNT | |
|---|---|---|
| **ACCOUNTING** | | |
| DELOITTE & TOUCHE LLP Total | 915,970 | SEE ATTACHED DETAIL |
| LESS: NON-CONFORMING D&T EXPENSES | (2,373) | |
| PRICEWATERHOUSE COOPERS LLP Total | 122,168 | SEE ATTACHED DETAIL |
| LESS: NON-CONFORMING PWC EXPENSES | (7) | |
| **ACCOUNTING TOTAL** | 1,035,758 | |
| | | |
| **CONSULTANTS** | | |
| DOLORES S STOKES DBA D STOKES CONSULTING | 17,290 | SEE ATTACHED DETAIL |
| EXPERT POWERHOUSE LLC DBA EXPERGY | 172,752 | SEE ATTACHED DETAIL |
| FINANCO INC | 125,220 | SEE ATTACHED DETAIL |
| GERALD W TUCKER CPA | 116,119 | SEE ATTACHED DETAIL |
| JAY HARTZELL | 12,525 | SEE ATTACHED DETAIL |
| MILLER & CHEVALIER CHARTERED | 19,443 | SEE ATTACHED DETAIL |
| TOWERS WATSON PENNSYLVANIA INC | 2,288 | SEE ATTACHED DETAIL |
| LESS: NON-CONFORMING TWP EXPENSES | (22) | |
| **CONSULTANTS TOTAL** | 465,915 | |
| | | |
| **LEGAL** | | |
| DUGGINS WREN MANN & ROMERO LLP | 2,406,607 | SEE ATTACHED DETAIL |
| LESS: NON-CONFORMING DWMR EXPENSES | (66) | |
| | | |
| **LEGAL TOTAL** | 2,406,541 | |
| | | |
| **INTERNAL RATE CASES EXPENSES (NON-PAYROLL)** | | |
| Business Meals/Entertainment | 3,852 | SEE ATTACHED DETAIL |
| Cities Bills-Lawton Law Firm | 1,117,309 | SEE ATTACHED DETAIL |
| Computer & Office Supplies | 758 | SEE ATTACHED DETAIL |
| Court Transcripts | 38,466 | SEE ATTACHED DETAIL |
| Depreciation & Amort Expenses | 207,683 | SEE ATTACHED DETAIL |
| Employee Mtgs/Functions | 7,762 | SEE ATTACHED DETAIL |
| Legal Notices | 100,799 | SEE ATTACHED DETAIL |
| Lodging | 18,959 | SEE ATTACHED DETAIL |
| Other Employee Expenses | 3,423 | SEE ATTACHED DETAIL |
| Other Office & General | 5,829 | SEE ATTACHED DETAIL |
| Pagers/Cellular Phones | 10 | SEE ATTACHED DETAIL |
| Personal Car Mileage - Local | 2,764 | SEE ATTACHED DETAIL |
| Postage and Overnight Delivery | 8,699 | SEE ATTACHED DETAIL |
| Printing, Mailing & Shipping | 12,601 | SEE ATTACHED DETAIL |
| Service Company Recipient | 348,640 | SEE ATTACHED DETAIL |
| Temporary Services | 66,943 | SEE ATTACHED DETAIL |
| Travel Transportation | 24,126 | SEE ATTACHED DETAIL |
| Utility Bills | 2,518 | SEE ATTACHED DETAIL |
| LESS: NON-CONFORMING COMPANY EXPENSES | (560) | |
| **INTERNAL RATE CASES EXPENSES (NON-PAYROLL) TOTAL** | 1,988,581 | |
| | | |
| **ESI PAYROLL, BENEFITS & TAXES** | 2,875,781 | SEE ATTACHED DETAIL |
| | | |
| **RATE CASE EXPENSES THROUGH 9/30/12** | 8,752,576 | |

Roadmap to Internal Rate Case Expenses – Tab 2

| Project | Year | Period | Resource | Resource Description | Submit Reason | Amount | Submit Reason | | Employee Name | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| F6PPETX011 | 2011 | 8 | 024 | Business Meals/Entertainment | | 49.39 | EEX_SUMMARY | AP10485738 | HEBERT,NEALIE D | 8052296 | 33342068 | 09938193 | 0526142367 |
| F6PPETX011 | 2011 | 9 | 024 | Business Meals/Entertainment | | 24.09 | EEX_SUMMARY | AP10489101 | TAYLOR JR,JOHN E | 9010567 | 33932660 | 09940671 | 0509113356 |
| F6PPETX011 | 2011 | 9 | 024 | Business Meals/Entertainment | | 69.48 | EEX_SUMMARY | AP10489339 | BARRILLEAUX,CHRIS E | 9013669 | 33419094 | 09955708 | 09121146322 |
| F6PPETX011 | 2011 | 9 | 024 | Business Meals/Entertainment | | 251.80 | EEX_SUMMARY | AP10489524 | CALDWELL,BRIAN W | 9012169 | 33417570 | 09959771 | 1008113544 |
| F6PPETX011 | 2011 | 10 | 024 | Business Meals/Entertainment | | 17.02 | EEX_SUMMARY | AP10477866 | TAYLOR JR,JOHN E | 9010567 | 33454667 | 09960104 | 10171112642 |
| F6PPETX011 | 2011 | 10 | 024 | Business Meals/Entertainment | | 27.46 | EEX_SUMMARY | AP10475268 | DOSS,GENE E | 9009602 | 33926911 | 09709411 | 1025114000 |
| F6PPETX011 | 2011 | 10 | 024 | Business Meals/Entertainment | | 40.00 | EEX_SUMMARY | AP10478103 | CALOGERO,WENDY D | 9017773 | 33957723 | 09713837 | 1105112199986 |
| F6PPETX011 | 2011 | 11 | 024 | Business Meals/Entertainment | | 16.31 | EEX_SUMMARY | AP10478615 | HERRINGTON,CHESTER | 9012296 | 33712973 | 09772826 | 1208118275447 |
| F6PPETX011 | 2011 | 12 | 024 | Business Meals/Entertainment | | 1,132.54 | EEX_SUMMARY | AP10485454 | FLOOD,JOHN C | 9010599 | 33851051 | 09773438 | 04111219093 |
| F6PPETX011 | 2012 | 4 | 024 | Business Meals/Entertainment | | 27.65 | EEX_SUMMARY | AP10505975 | THIRY,MICHELLE H | 9009468 | 34453909 | 09932859 | 0419126696 |
| F6PPETX011 | 2012 | 4 | 024 | Business Meals/Entertainment | | 40.77 | EEX_SUMMARY | AP10504195 | MORGAN,WILLIAM R | 9010724 | 34456677 | 09941367 | 04112419876 |
| F6PPETX011 | 2012 | 4 | 024 | Business Meals/Entertainment | | 207.13 | EEX_SUMMARY | AP10505194 | DOMINO,JOSEPH F | 9012162 | 34498366 | 09943519 | 0429120669 |
| F6PPETX011 | 2012 | 4 | 024 | Business Meals/Entertainment | | 50.14 | EEX_SUMMARY | AP10505873 | CONSIDINE,MICHAEL P | 9041263 | 34408654 | 09946165 | 0430128902 |
| F6PPETX011 | 2012 | 5 | 024 | Business Meals/Entertainment | | 38.16 | EEX_SUMMARY | AP10507633 | COOPER,ROBERT R | 9010845 | 34659125 | 09960070 | 0501123548 |
| F6PPETX011 | 2012 | 5 | 024 | Business Meals/Entertainment | | 40.99 | EEX_SUMMARY | AP10507633 | GARRISON,WINFRED W | 9012398 | 34501198 | 09952733 | 0450121391445 |
| F6PPETX011 | 2012 | 5 | 024 | Business Meals/Entertainment | | 123.30 | EEX_SUMMARY | AP10507633 | TUMMINELLO,STEPHANIE B | 9026942 | 34596166 | 09694237 | 05011211B001 |
| F6PPETX011 | 2012 | 5 | 024 | Business Meals/Entertainment | | 22.46 | EEX_SUMMARY | AP10507633 | CHISHOLM,MARIA F | 9031045 | 34988637 | 09954418 | 05012105641 |
| F6PPETX011 | 2012 | 5 | 024 | Business Meals/Entertainment | | 42.91 | EEX_SUMMARY | AP10507633 | LEBLANC,HEATHER G | 9002452 | 34957693 | 09964425 | 05011249996 |
| F6PPETX011 | 2012 | 5 | 024 | Business Meals/Entertainment | | 118.46 | EEX_SUMMARY | AP10507633 | MCCULLA,MARK F | 9023066 | 34957607 | 09909369 | 0509124369 |
| F6PPETX011 | 2012 | 5 | 024 | Business Meals/Entertainment | | 21.59 | EEX_SUMMARY | AP10509139 | COOPER,ROBERT R | 9010645 | 34958301 | 09949309 | 0507122698 |
| F6PPETX011 | 2012 | 5 | 024 | Business Meals/Entertainment | | 47.49 | EEX_SUMMARY | AP10509139 | CICIO,PATRICK J | 9011616 | 34952215 | 09956963 | 05071230159B |
| F6PPETX011 | 2012 | 5 | 024 | Business Meals/Entertainment | | 218.01 | EEX_SUMMARY | AP10509139 | TALUNGTON,MYRA L | 9014366 | 34952262 | 09966120 | 050912B425 |
| F6PPETX011 | 2012 | 5 | 024 | Business Meals/Entertainment | | 43.96 | EEX_SUMMARY | AP10509139 | CONSIDINE,MICHAEL P | 9041263 | 34960124 | 09949968 | 05071217309 |
| F6PPETX011 | 2012 | 5 | 024 | Business Meals/Entertainment | | 50.14 | EEX_SUMMARY | AP10509144 | PIERCE JR,HUGH VERNON | 9012421 | 34709798 | 09960263 | 05051224611 |
| F6PPETX011 | 2012 | 5 | 024 | Business Meals/Entertainment | | 102.91 | EEX_SUMMARY | AP10509070 | LEWIS,JAY A | 9034706 | 34719160 | 09971187 | 05971230X380 |
| F6PPETX011 | 2012 | 5 | 024 | Business Meals/Entertainment | | 123.93 | EEX_SUMMARY | AP10500903 | BARRILLEAUX,CHRIS E | 9013669 | 34716191 | 09971260 | 05141243X310 |
| F6PPETX011 | 2012 | 5 | 024 | Business Meals/Entertainment | | 56.48 | EEX_SUMMARY | AP10500903 | MCILVOY,KAREN | 9003466 | 34725726 | 09972921 | 0515123X085 |
| F6PPETX011 | 2012 | 5 | 024 | Business Meals/Entertainment | | 60.83 | EEX_SUMMARY | AP10509061 | MAY JR,PHILLIP R | 9013548 | 34754436 | 09977315 | 0509122422 |
| F6PPETX011 | 2012 | 5 | 024 | Business Meals/Entertainment | | 190.11 | EEX_SUMMARY | AP10509256 | WESTERBURG JR,LOUIS R | 9010650 | 34758356 | 09991193 | 0518194283 |
| F6PPETX011 | 2012 | 5 | 024 | Business Meals/Entertainment | | 60.40 | EEX_SUMMARY | AP10509653 | MCILVOY,KAREN | 9032466 | 34771196 | 09998997 | 0524121156121 |
| F6PPETX011 | 2012 | 5 | 024 | Business Meals/Entertainment | | 82.66 | EEX_SUMMARY | AP10510200 | MCCLOSKEY,MARGARET | 9039163 | | | |
| F6PPETX011 | 2012 | 5 | 024 | Business Meals/Entertainment | | 88.04 | EEX_SUMMARY | AP50000002 | (Bank Value) | | | | |
| F6PPETX011 | 2012 | 6 | 024 | Business Meals/Entertainment | | 148.54 | EEX_SUMMARY | AP10512821 | GALBRAITH,PATRICIA | 9012159 | 34845677 | 10001397 | 05071212396 |
| F6PPETX011 | 2012 | 6 | 024 | Business Meals/Entertainment | | 11.04 | EEX_SUMMARY | AP10512821 | ROBERTS,JACKY LUTHER | 9015066 | 34910302 | 09995918 | 0525121727164 |
| F6PPETX011 | 2012 | 6 | 024 | Business Meals/Entertainment | | 33.19 | EEX_SUMMARY | AP10512526 | BLANKLEY,JACK T | 9010999 | 34936196 | 09990088 | 0524120725 |
| F6PPETX011 | 2012 | 6 | 024 | Business Meals/Entertainment | | 88.04 | EEX_SUMMARY | AP10512526 | PIERCE JR,HUGH VERNON | 9012421 | 34769404 | 09998666 | 0524121013583 |

Roadmap to Internal Rate Case Expenses -- Tab 2

| | | | Description | | | | | JAYCOX,DEVON S | 3465943 | 1000341 | 0508120071 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| F&PPETX011 | 2012 | 6 024 | Business Meals/Entertainment | 59.11 | EEX_SUMMARY | API051304 | API061585 | MAY JR,PHILLIP R | 3494122 | 10024797 | 0521122151353 |
| F&PPETX011 | 2012 | 6 024 | Business Meals/Entertainment | 20.00 | EEX_SUMMARY | API061585 | 5013546 | (Blank Value) | | | |
| F&PPETX011 | 2012 | 6 024 | Business Meals/Entertainment | -88.04 | EEX_SUMMARY | APE000002 | | | | | |
| F&PPETX011 | 2012 | 7 024 | Business Meals/Entertainment | 123.14 | EEX_SUMMARY | API0517815 | 901094 | GARDNER,KEVIN G | 3499/933 | 10028776 | 05212180988 |
| F&PPETX011 | 2011 | 10 276 | Computer & Office Supplies | 90.82 | OGL_SUMMARY | APE047502 | 091644 | CITIBANK USA NA | 3354852 | 09708080 | 1353358_21 |
| F&PPETX011 | 2011 | 10 276 | Computer & Office Supplies | 3.14 | OGL_SUMMARY | APE047589 | 091644 | CITIBANK USA NA | 3354852 | 09708080 | 1353358_21 |
| F&PPETX011 | 2011 | 11 276 | Computer & Office Supplies | 94.62 | OGL_SUMMARY | APE040375 | 091644 | CITIBANK USA NA | 3370982 | 09747678 | 1355745_21 |
| F&PPETX011 | 2012 | 2 276 | Computer & Office Supplies | 461.33 | OGL_SUMMARY | APE04790 | 091644 | CITIBANK USA NA | 34177535 | 09861268 | 1409712_21 |
| F&PPETX011 | 2012 | 2 276 | Computer & Office Supplies | 28.18 | OGL_SUMMARY | APE048439 | 091644 | CITIBANK USA NA | 34177535 | 09861268 | 1409712_21 |
| F&PPETX011 | 2012 | 3 276 | Computer & Office Supplies | 52.07 | OGL_SUMMARY | APE050098 | 091644 | CITIBANK USA NA | 34397270 | 09980907 | 1422474_21 |
| F&PPETX011 | 2011 | 7 805 | Depreciation & Amort Expenses | 5,659.23 | DPR_SUMMARY | ALD046262 | | (Blank Value) | | | |
| F&PPETX011 | 2011 | 8 805 | Depreciation & Amort Expenses | 14,467.84 | DPR_SUMMARY | ALD046771 | | (Blank Value) | | | |
| F&PPETX011 | 2011 | 9 805 | Depreciation & Amort Expenses | 15,071.03 | DPR_SUMMARY | ALD047216 | | (Blank Value) | | | |
| F&PPETX011 | 2011 | 10 805 | Depreciation & Amort Expenses | 18,109.77 | DPR_SUMMARY | ALD047643 | | (Blank Value) | | | |
| F&PPETX011 | 2011 | 11 805 | Depreciation & Amort Expenses | 17,695.99 | DPR_SUMMARY | ALD048781 | | (Blank Value) | | | |
| F&PPETX011 | 2011 | 12 805 | Depreciation & Amort Expenses | 11,303.66 | DPR_SUMMARY | ALD048978 | | (Blank Value) | | | |
| F&PPETX011 | 2012 | 1 805 | Depreciation & Amort Expenses | 14,062.37 | DPR_SUMMARY | ALD049149 | | (Blank Value) | | | |
| F&PPETX011 | 2012 | 2 805 | Depreciation & Amort Expenses | 28,099.19 | DPR_SUMMARY | ALD049156 | | (Blank Value) | | | |
| F&PPETX011 | 2012 | 3 805 | Depreciation & Amort Expenses | 16,081.98 | DPR_SUMMARY | ALD0601625 | | (Blank Value) | | | |
| F&PPETX011 | 2012 | 4 805 | Depreciation & Amort Expenses | 27,390.63 | DPR_SUMMARY | ALD050538 | | (Blank Value) | | | |
| F&PPETX011 | 2012 | 5 805 | Depreciation & Amort Expenses | 20,305.17 | DPR_SUMMARY | ALD0611258 | | (Blank Value) | | | |
| F&PPETX011 | 2012 | 6 805 | Depreciation & Amort Expenses | 7,243.94 | DPR_SUMMARY | ALD0516344 | | (Blank Value) | | | |
| F&PPETX011 | 2012 | 7 805 | Depreciation & Amort Expenses | 4,175.10 | DPR_SUMMARY | ALD063126 | | (Blank Value) | | | |
| F&PPETX011 | 2012 | 8 805 | Depreciation & Amort Expenses | 2,739.99 | DPR_SUMMARY | ALD053671 | | (Blank Value) | | | |
| F&PPETX011 | 2011 | 8 027 | Employee Mtgs/Functions/Awards | 64.05 | EEX_SUMMARY | APE046991 | 091644 | CITIBANK USA NA | 3354078 | 09625933 | 1327858_21 |
| F&PPETX011 | 2011 | 8 027 | Employee Mtgs/Functions/Awards | 183.64 | EEX_SUMMARY | APE046991 | 091644 | CITIBANK USA NA | 3351747 | 09625933 | 1327858_21 |
| F&PPETX011 | 2011 | 9 027 | Employee Mtgs/Functions/Awards | 34.96 | EEX_SUMMARY | APE047204 | 091644 | CITIBANK USA NA | 3353585 | 09665966 | 1340013_20 |
| F&PPETX011 | 2011 | 9 027 | Employee Mtgs/Functions/Awards | 155.18 | EEX_SUMMARY | APE047204 | 091644 | CITIBANK USA NA | 3949423 | 09669955 | 1340013_20 |
| F&PPETX011 | 2011 | 10 027 | Employee Mtgs/Functions/Awards | 31.00 | EEX_SUMMARY | API047973 | 9010665 | WARD,BARBARA L | 3354707 | 09888919 | 1007115447 |
| F&PPETX011 | 2011 | 10 027 | Employee Mtgs/Functions/Awards | 154.80 | EEX_SUMMARY | APE047502 | 091644 | CITIBANK USA NA | 3354893 | 09708080 | 1353358_21 |
| F&PPETX011 | 2011 | 11 027 | Employee Mtgs/Functions/Awards | 193.34 | EEX_SUMMARY | APE049059 | 091644 | CITIBANK USA NA | 3370590 | 09747676 | 1355745_20 |
| F&PPETX011 | 2011 | 11 027 | Employee Mtgs/Functions/Awards | 320.66 | EEX_SUMMARY | APE060375 | 091644 | CITIBANK USA NA | 3370382 | 09747976 | 1355745_21 |
| F&PPETX011 | 2011 | 11 027 | Employee Mtgs/Functions/Awards | 2.72 | EEX_SUMMARY | APE060560 | 091644 | CITIBANK USA NA | 33709362 | 09747976 | 1355745_21 |
| F&PPETX011 | 2011 | 12 027 | Employee Mtgs/Functions/Awards | 164.95 | EEX_SUMMARY | APE049656 | 091644 | CITIBANK USA NA | 3354161 | 09764910 | 1391991_21 |
| F&PPETX011 | 2011 | 12 027 | Employee Mtgs/Functions/Awards | 1,300.39 | EEX_SUMMARY | APE045910 | 091644 | CITIBANK USA NA | PCARD | 09764009 | 1391991_20 |
| F&PPETX011 | 2012 | 1 027 | Employee Mtgs/Functions/Awards | 57.25 | EEX_SUMMARY | APE089627 | 091644 | CITIBANK USA NA | 34070095 | 09823782 | 1390371_20 |
| F&PPETX011 | 2012 | 2 027 | Employee Mtgs/Functions/Awards | 181.69 | EEX_SUMMARY | APE048790 | 091644 | CITIBANK USA NA | 34177535 | 09861268 | 1409712_21 |